### In the Matter of WOODBROOK ASSOCIATES, Debtor–Appellant.

### No. 92–4014.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1993.

Decided March 18, 1994.

Rehearing Denied May 12, 1994.

Jeffrey L. Hunter, Asst. U.S. Atty. (argued), Indianapolis, IN, for appellee.

Thomas D. Titsworth, John M. Rogers (argued), Bamberger & Feibleman, Indianapolis, IN, for debtor-appellant.

Before POSNER, Chief Judge, CUMMINGS, Circuit Judge, and ZAGEL, District Judge.*

ZAGEL, District Judge.

Woodbrook Associates ("Woodbrook"), is an Indiana real estate limited partnership whose sole asset is the Woodbrook Apart-

---

* The Honorable James B. Zagel, District Judge for the Northern District of Illinois, is sitting by designation.

ments constructed in 1980 in Indianapolis. The apartment complex was primarily funded by a first mortgage loan of $5,559,700.00, at 7.5%, insured by the United States Department of Housing and Urban Development (HUD). Woodbrook Apartments failed to generate the expected income levels, the partnership defaulted, and the original mortgage holder assigned the mortgage in 1988 to HUD.

In July 1990, HUD advertised Woodbrook Apartments for sale by private bid on September 5, 1990, stating that it would not bid over $3.4 million. On August 21, 1990, Woodbrook filed a voluntary Chapter 11 petition, and the advertised foreclosure sale was stayed.

Deci–Ma Management Corporation ("Deci–Ma Management") continued to serve as project manager of the apartments during the bankruptcy, as it had since the inception of the project.[1] Woodbrook then ceased paying net operating revenues to HUD, which had been less than the stipulated debt service.

Woodbrook filed a proposed Plan of Reorganization on April 19, 1991, eight months after the bankruptcy petition, and a substantially similar amended plan on June 14, 1991, by which time Woodbrook had possession of a net operating surplus of about $225,000 which it would otherwise have paid to HUD. The plan creates eight classes of claims and interests. Classes 1 and 2, as is typical, are reserved for expenses incurred by professionals and other administrative costs. Payments to creditors are structured as follows: HUD's secured claim (Class 3), valued at $3.6 million, is to be paid over 30 years at the mortgage interest rate of 7.5%; HUD will also be paid 5% of its unsecured deficiency claim (Class 4), plus all funds on hand at confirmation excluding $100,000 (reserved for repairs, working capital and bankruptcy fees, and expenses); Deci–Ma Management's unsecured claim (Class 5) will be paid in full over one year; Deci–Ma Corporation's unsecured claim (Class 6) will be paid monthly from any remaining cash flow from the debt-

or's operations until paid in full; other unsecured creditors (Class 7) will be paid in full 30 days after confirmation; and the general and limited partners of the debtor (Class 8) will retain their ownership interests in return for new capital contributions. The plan also provides in Article IV that, in the event the Bankruptcy Court determines the plan cannot be confirmed as a consequence of the proposed retention of ownership by the general and limited partners (Class 8), their interests will be deemed cancelled and void (presumably along with their obligation to contribute new capital) and the "property of the estate" will, instead, vest in Deci–Ma Corporation (Class 6), in satisfaction of its general unsecured claim. Funding for the plan would be secured from apartment rentals and the new cash infusion by "a new corporate general partner that will be substituted for the existing general partners." This new cash contribution would be used to pay off the 5% distribution on HUD's unsecured deficiency claim, unless Article IV was triggered. Finally, the cash on hand would be allocated first to administrative expenses, then to a $100,000 fund for roof repairs and working capital, and ultimately to HUD's unsecured claim.

The next month, before any confirmation hearing or voting on the amended plan, HUD moved to dismiss the bankruptcy case, saying that HUD would not accept Woodbrook's proposed plan or any plan not providing for full payment of its claim. At the hearing on the motion, Sam Birch, a HUD loan specialist, swore that the plan was not "fair" and said that he did not have authority to accept any plan other than one which paid HUD in full. Charles Harvey, a Woodbrook general partner, testified the project was worth $3.6 million and the occupancy rate for the complex was 95% at the time of the amended plan. He also confirmed that the "principal" of Deci–Ma Management was his brother-in-law, that Woodbrook was maintaining the property, and that Woodbrook would be able

---

1. The record is unclear as to how Deci–Ma Corporation served Woodbrook and its relationship to Deci–Ma Management. The district court found (and we agree) that Deci–Ma Corporation appears to be affiliated with Deci–Ma Management. Deci–Ma Corporation, however, has an unsecured claim of about $30,000, which presumably constitutes some sort of trade debt separate from the management fees owed to Deci–Ma Management.

to make the payments provided in the plan. The Disclosure Statement filed by Harvey on July 1, 1991, stated that his wife, Patricia Harvey, "owns 48% of the common capital stock of Deci–Ma Corporation which is insolvent and is a Chapter 11 debtor in bankruptcy proceedings."

The bankruptcy court found, in part, that HUD would not accept any plan which did not provide for full payment of its claim; that general partner Charles Harvey had a beneficial interest in Deci–Ma Management and Deci–Ma Corporation; that HUD objected to Woodbrook's use of the money it kept; and that the plan could not be confirmed over HUD's objection. The court ultimately dismissed the bankruptcy case for cause, concluding that: (1) the plan could not be confirmed because it unfairly discriminated among unsecured creditors and violated the absolute priority rule; (2) the plan was not feasible because it relied on the use of funds in which HUD had a lien without HUD's consent; and (3) the proposal of an unconfirmable plan constituted an unreasonable delay and prejudiced the creditors.

Woodbrook then moved under Bankruptcy Rule 9023 to amend the findings and conclusions or, alternatively, to file an amended plan. The Rule 9023 motion said that the dismissal was unsupported by the evidence and contrary to law and that it decided issues not raised by HUD's motion. Lastly, Woodbrook asked for leave to file an amended plan providing for full payment of HUD's claim of $6,208,273.24, plus interest, under terms which it believed would quell the court's concerns, but it did not say what those terms were. The bankruptcy court denied the Rule 9023 motion and did not permit Woodbrook to file a second amended plan. The district court affirmed, holding that Woodbrook would not be able to effectuate the proposed plan because it improperly classified unsecured claims in separate classes, violated the absolute priority rule, and did not meet the new value exception.

■ Woodbrook now appeals the district court's order, as it may under 28 U.S.C. §§ 158 and 1291. On appeal, this Court must accept the bankruptcy court's findings of fact unless they are clearly erroneous, a tough test. *Matter of Excalibur Auto. Corp.*, 859 F.2d 454, 457, n. 3 (7th Cir.1988). Conclusions of law are reviewed *de novo. Id.*

## DISMISSAL FOR CAUSE

■ A bankruptcy court has broad discretion under 11 U.S.C. § 1112(b) to dismiss a Chapter 11 case for cause. *In re Lumber Exchange Bldg. Ltd. Partnership*, 968 F.2d 647, 648 (8th Cir.1992). Woodbrook's bankruptcy case was dismissed under § 1112(b)(2), which authorizes dismissals for the inability to effectuate a plan. A § 1112(b)(2) dismissal is proper "if the court determines that it is unreasonable to expect that a plan can be confirmed in the [C]hapter 11 case." 5 CONRAD K. CYR ET AL., COLLIER ON BANKRUPTCY ¶ 1112.03[2][d][ii], at 1112-19–20 (15th ed. 1993).

## NOTICE

■ Woodbrook says it did not have adequate notice of the issues considered by the bankruptcy court and so was foreclosed from either offering appropriate evidence or amending the plan. A review of the motion compels us to reject Woodbrook's assertion. HUD's motion plainly states that HUD "will not accept the Plan as filed, or any other Plan not providing for payment in full of its claim." This declaration in the context of a motion to dismiss should have alerted Woodbrook to the potential confirmation problems addressed by the courts below since the major creditor comprising an impaired class (or two) of unsecured creditors rejected the plan. Although it would have been desirable for HUD to spell out in detail all the alleged defects in the plan, its failure to do so is not fatal and neither deprived Woodbrook of adequate notice nor prejudiced Woodbrook at the hearing. This formal notice is adequate and, in fact, Woodbrook had actual notice. HUD quotes, without contradiction, Woodbrook's memorandum in opposition to dismissal where Woodbrook said, "[T]he issue raised by the government's Motion is whether the unsecured deficiency claim of HUD must be classified in the same class with all other general unsecured creditors. If this is the case, the debtor will be unable to obtain acceptance by any unimpaired class." Wood-

brook cannot reasonably claim ignorance of the issues raised in HUD's motion to dismiss.

## TIMING

 Nor can Woodbrook win on a claim that dismissal was premature. A Chapter 11 case can be dismissed at any time. Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired. *In re Park Ave. Partners Ltd. Partnership*, 95 B.R. 605, 609 (Bankr. E.D.Wis.1988). Creditors, likewise, need not incur the added time and expense of a confirmation hearing on a plan they believe cannot be effectuated. *See Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir.1989) (case dismissed where acceptable plan was not filed within eight months of Chapter 11 petition). The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless. The bankruptcy court found cause to dismiss the case under 11 U.S.C. § 1112(b), and it was not required to consider alternative remedies other than conversion to Chapter 7 in the best interest of the creditors. No one here claims (or claimed below) that conversion is in the best interest of the creditors.

## BURDEN OF PROOF

 Woodbrook argues that the bankruptcy court erred in placing a burden of proof on Woodbrook. The sentence in the ruling on which Woodbrook relies for this argument reads: "In the instant case, debtor has not produced sufficient evidence to demonstrate that the interests of the non-HUD creditors are sufficiently unique to warrant separate classification." This sentence, however, is quoted from the district court's opinion and does not reflect the standard of proof used by the bankruptcy court. Nor does it show that the district court applied the wrong standard of proof on review. Where a motion to dismiss for cause is opposed, the movant bears the burden of proving by a preponderance of the evidence that cause exists for dismissal of the debtor's bankrupt-

cy case. 5 Collier on Bankruptcy ¶ 1112.03[2][a], at 1112–16; *Colonial Daytona Ltd. Partnership v. American Sav. of Fla., F.S.B.*, 152 B.R. 996, 1002 (M.D.Fla.1993). That HUD bears the burden of persuasion, however, does not eviscerate Woodbrook's obligation to produce evidence in opposition to a well-supported motion. Viewed sensibly in the context of the entire opinion, the quoted sentence reflects the district court's view of the sufficiency of the evidence presented at the hearing and HUD's success in persuading the courts that cause for dismissal existed based on Woodbrook's classification scheme. The district court did not err in its placement of the burden of proof or application of standards of review.

## CLASSIFICATION OF CREDITORS

 Did cause exist to dismiss Woodbrook's Chapter 11 case? Woodbrook argues that separate classification of HUD's § 1111(b) unsecured deficiency claim[2] was proper because the amount and character of HUD's claim rendered it different from the unsecured claims of other creditors. HUD maintains that dismissal for cause was proper because Woodbrook engaged in "abusive" classification aimed at gerrymandering an affirmative vote. We review *de novo* the propriety of classification. *Lumber Exchange*, 968 F.2d at 649.

 Woodbrook possesses considerable, but not complete, discretion to classify claims and interests in its Chapter 11 plan of reorganization. *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990). Some limits are necessary to offset a debtor's incentive to manipulate a classification scheme and ensure the affirmative vote of at least one impaired class, which is what the debtor needs to gain confirmation of the plan. *Id.; In re U.S. Truck Co., Inc.*, 800 F.2d 581, 586 (6th Cir.1986). What these limits may be is subject to debate. Section 1122(a) says: "a plan may place a claim or interest in a particular class only if such claim or interest is

---

**2.** A § 1111(b) unsecured deficiency claim is created in favor of an undersecured creditor in the amount of the lien in excess of the collateral's value, *i.e.*, an undersecured creditor has a secured claim up to the value of the collateral and

an unsecured claim for the deficiency. 11 U.S.C. §§ 506(a), 1111(b). An undersecured creditor, however, may waive its deficiency claim and elect, under § 1111(b)(2), to have its claim treated as secured for the entire amount of the debt.

substantially similar to the other claims or interest of such class." 11 U.S.C. § 1122(a).[3] Section 1122 does not expressly forbid the separate classification of similar claims. Yet, the Fifth Circuit has coined a phrase referred to as the "one clear rule": "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on reorganization." *Matter of Greystone III Joint Venture,* 995 F.2d 1274, 1279 (5th Cir.1991). *Greystone* condones separate classification "for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." *Id.; accord Lumber Exchange,* 968 F.2d at 649; *In re Johnston,* 140 B.R. 526, 529 (9th Cir. BAP 1992).

The "one clear rule" is not easy to apply since it is not about "classifying similar claims"; it is about the debtor's purpose. Similarity is not a precise relationship, and the elements by which we judge similarity or resemblance shifts from time to time in bankruptcy. Some courts had permitted separate classification based simply on a readily perceived legal distinction between unsecured deficiency claims created by § 1111(b) and general unsecured claims. These courts noted that general unsecured claims are recourse claims cognizable under state law while § 1111(b) claims exist only within a Chapter 11 bankruptcy case and are not cognizable under state law. *See, e.g., In re Aztec Co.,* 107 B.R. 585, 587 (Bankr. M.D.Tenn.1989). This legal distinction has been eliminated by the Code (because a § 1111(b) deficiency claim is an unsecured claim in Chapter 11), and it has been rejected as the sole basis for separate classification by a majority of circuits. 11 U.S.C. § 1111(b)(1)(A); *Greystone,* 995 F.2d at 1279; *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assocs.,* 987 F.2d 154, 161 (3rd Cir.1993); *Lumber Exchange,* 968 F.2d at 649. Other courts have permitted sepa-

rate classification on the grounds that the vote of § 1111(b) claims "will be uniquely affected by the plan's proposed treatment of the secured claim held by the creditor"; a § 1111(b) claimant may vote its large deficiency claim to defeat any plan, obtain relief from the automatic stay and foreclose, while the general unsecured claimant has a strong incentive to vote to accept the plan because it may receive nothing from liquidating the debtor if the automatic stay is lifted. *In re SM 104 Ltd.,* 160 B.R. 202, 218 & n. 35 (Bankr.S.D.Fla.1993) (voting incentive rationale "is highly persuasive when viewed in light of the logic underlying § 1129(a)(10) ... [which was] intended not to give the real estate lobby a veto power, but merely to require 'some indicia of creditor support' for confirmation of a proposed Chapter 11 plan"); *Aztec,* 107 B.R. at 587.[4] The voting incentive theory is worthy of careful study, but we need not reach the question of whether the voting incentive rationale supports the separate classification of HUD's claim.

Significant disparities do exist between the legal rights of the holder of a § 1111(b) claim and the holder of a general unsecured claim which render the two claims not substantially similar and which preclude the two from being classified together under § 1122(a). Thus, we cannot accept the proposition implicit in *Greystone* that separate classification of a § 1111(b) claim is nearly conclusive evidence of a debtor's intent to gerrymander an affirmative vote for confirmation. These disparities in rights stem from the most obvious difference between the two claims: a general unsecured claim exists in all chapters of the Code, while a § 1111(b) claim exists only as long as the case remains in Chapter 11 and, once converted to a Chapter 7 case, recovery is limited to its collateral. *Compare* 11 U.S.C. § 103(f) *with* 11 U.S.C. § 502(b)(1). This

---

**3.** Subsection (b) provides: "A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b) (1988). Woodbrook has designated such a class of unnamed unsecured creditors. However, there is no dispute regarding the propriety of Woodbrook's classification in this respect.

**4.** *But see Route 37,* 987 F.2d at 161–62 (rejecting voting incentive rationale because "absent bad faith or illegality ..., the Code is not concerned with a claim holder's reason for voting one way or another ... [and because,] undoubtedly, most claim holders vote in accordance with their overall economic interests," not simply creditor interests).

difference is amplified when the debtor is a partnership (as in this case) and the creditors face possible failure of its Chapter 11 case. Under such circumstances, the general unsecured creditors can seek equitable relief to prevent dissipation of the assets of the general partners, who upon conversion to Chapter 7, are liable for the debts of the partnership. Such equitable relief is not likely to be available to a § 1111(b) claimant, whose recovery is confined to its collateral.

This legal difference between the two claims also can lead to anomalous results when applying other sections of the Code to a class containing both § 1111(b) claimants and general unsecured claimants. First, section 1129(a)(7) requires that, for confirmation of a plan where a holder of a claim or interest in an impaired class rejects the plan, each claimant must "receive or retain ... property of a value, as of the effective date of the plan, that is not less than the amount ... receive[d] or retain[ed] if the debtor were liquidated under [C]hapter 7." 11 U.S.C. § 1129(a)(7). A § 1111(b) claimant is not entitled to payment under Chapter 7. Yet, because the § 1111(b) claimant has been classified with other general unsecured creditors and because § 1123(a)(4) mandates the same treatment of all claims in the class, the § 1111(b) claimant can block confirmation unless it receives payment of an amount equal to that of the general unsecured creditors. More importantly, there are anomalies in the application of § 1111(b) itself. Section 1111(b)(a)(A)(i), which requires that a § 1111(b)(2) election be made by "the class of which such [§ 1111(b)] claim is a part," means the general unsecured creditors, included in the class, must vote on whether the § 1111(b) claimants should make the § 1111(b)(2) election. The general unsecured creditors, consequently, can block approval of the election by a majority of votes. 11 U.S.C. § 1111(b)(1)(A)(i); Fed.R.Bankr.P. 3014. Finally, general unsecured creditors, who have no lien claims, can participate in the election process because the class comprised of the § 1111(b) claimants holds collateral that is not of inconsequential value.[5] These anomalies are all clearly set out in

Judge Ginsberg's well-reasoned opinion, *In re SM 104 Ltd.,* 160 B.R. 202, 219–21 (Bankr. S.D.Fla.1993).

■ The drafters of the Bankruptcy Code did not intend these results. We find that, at least where the debtor is a partnership comprised of a fully encumbered single asset, the legal rights of a § 1111(b) claimant are substantially different from those of a general unsecured claimant. Accordingly, we hold that §§ 1111(b) and 1122(a) not only permit but require separate classification of HUD's § 1111(b) unsecured deficiency claim in Class 4. Woodbrook's separate classification of HUD's § 1111(b) claim neither prevents confirmation of Woodbrook's plan nor serves as conclusive evidence in this case that Woodbrook manipulated the plan to obtain an affirmative vote. The bankruptcy court, however, found other barriers to confirmation.

## ABSOLUTE PRIORITY RULE

■ To be confirmed under the cramdown provision of the Code, a plan must satisfy the absolute priority rule. That is, the claims or interests of a dissenting class of unsecured creditors must be fully satisfied before any junior class may retain any property under the reorganization plan. 11 U.S.C. § 1129(b)(2)(C); *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988); *Matter of Snyder,* 967 F.2d 1126, 1128 (7th Cir.1992). HUD says the proposed retention of ownership interest by the partners of the debtor, without payment in full of HUD's claim, violates the rule. Woodbrook counters that the partners' infusion of new capital contributions in exchange for their ownership interests places the plan outside the rule.

■ The new value precept permits old equity owners to participate in a plan, without full payment to the dissenting creditors, if they make a new contribution (1) in money or money's worth, (2) that is reasonably equivalent to the value of the new equity interests in the reorganized debtor, and (3)

---

**5.** Section 1111(b)(1)(B) denies the right to make an election to "[a] class of claims" if the lien

claims of the class members are of "inconsequential value." 11 U.S.C. § 1111(b)(1)(B).

that is necessary for implementation of a feasible reorganization plan. *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121–22, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939). Under this precept, old equity owners may purchase new equity interests in the reorganized debtor.

The new value precept, though mentioned in the Bankruptcy Commission's report to Congress, was not expressly codified in the Bankruptcy Code of 1978. *Report of the Commission on the Bankruptcy Laws of the United States*, H.R.Doc. No. 137, 93rd Cong., 1st Sess. pt. 2 at 241–42. Whether it survives the enactment of the new Code is the subject of much debate. The current trend is to treat the new value precept not as an exception (as it was commonly called) but as a corollary to the absolute priority rule preserved in the 1978 Code. *See Snyder*, 967 F.2d at 1130–31. The Supreme Court has yet to endorse or condemn such an interpretation of the Code,[6] and we follow our prior decisions [7] and again reserve ruling on the viability of the new value precept until another day. We reserve ruling because, even if we assume that this precept survives, we find the record supports the lower courts' conclusion that the proposed $100,000 contribution does not satisfy the new value criteria.

■■■ The district court reasoned that a proposed new capital infusion of $100,000 could not be considered "substantial" since it constituted, at most, 3.8% of the approximately $2.6 million of total unsecured debt.[8] Simply put, "substantiality" requires that the contribution be real and necessary to the successful implementation of a feasible plan. *Snyder*, 967 F.2d at 1131; *see SM 104*, 160 B.R. at 226 n. 43 (finding it difficult to believe a contribution that is real and renders

the plan feasible would not qualify as "substantial"). Essentially, what the lower courts determined was that the proposed contribution, though in money, was a token cash infusion and not a fair price for the right to participate in the reorganized debtor. A token cash infusion violates the absolute priority rule because the old equity owners are receiving the opportunity to purchase the new equity interests at a bargain price "on account of" their prepetition ownership. *See Matter of Stegall*, 865 F.2d 140, 144 (7th Cir.1989); *SM 104*, 160 B.R. at 226–27.

■■■ Whether the infusion of new capital is "substantial" is more a common sense determination than a mathematical calculation when the debtor comprises only a single real estate asset which is fully encumbered. And, as this Circuit noted in *Snyder*, this determination may not always hinge on a comparison of the proposed contribution to the total amount of unsecured debt. *Snyder*, 967 F.2d at 1131. A court must make an informed judgment based on the facts of each case. We cannot say in this case, "where the disparity between the contribution and the unsecured debt is so extreme," that the lower courts' finding of insubstantiality is clearly erroneous. *See Snyder*, 967 F.2d at 1131–32 (refusing to disturb the bankruptcy and district courts' finding that the infusion of $30,-000 in new capital, which was just 4.5% of the total amount due unsecured creditors, was not substantial). We agree with the courts below that the proposed token cash infusion does not constitute "new value" and violates the absolute priority rule. A Chapter 11 plan that violates the absolute priority rule cannot be confirmed over a creditor's legitimate objections. *Ahlers*, 485 U.S. at 202, 108 S.Ct. at 966 (1988).[9]

---

6. The Supreme Court, however, has granted *certiorari* in *In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993), cert. granted, —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994). After a thorough analysis of the 1978 Code, the Ninth Circuit held that the new value corollary, or "the scrutinize old equity participation rule," continues to be a "vital legal principle." *Id.* at 906–17.

7. *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1362 (7th Cir.

1990); *In re Stegall*, 865 F.2d 140, 142 (7th Cir.1989).

8. The bankruptcy court concluded that the plan violated the absolute priority rule. The district court clarified the basis of the bankruptcy court's conclusion.

9. Woodbrook insists that whether the amount of capital infusion is substantial is a determination that must be made at the confirmation hearing. Dismissal here was not premature. A bankruptcy court need not engage in any further analysis

■ Woodbrook urges that Article IV saves the plan by voiding the partners' interests and vesting them in Deci–Ma Corporation in the event the bankruptcy court rejects the new value proposal. We disagree. The proposed "savings clause" may sound the plan's death knell. If Article IV is triggered, the 5% distribution to HUD is voided. The ultimate effect is to divest HUD of the 5% distribution towards its unsecured claim and vest the "property of the estate" in Deci–Ma Corporation in satisfaction of its unsecured claim. Deci–Ma Corporation's receipt of an equity interest without new cash infusion may violate the absolute priority rule. Furthermore, a fair reading of Article IV is that the new cash infusion is cancelled, and the cancellation of the new cash infusion confirms that the contribution is not necessary for the implementation of Woodbrook's plan and cannot qualify as "new value."

On the other hand, it may be that Deci–Ma Corporation's receipt of equity interests as payment of its unsecured claim does not violate the absolute priority rule since Deci–Ma Corporation is not a prepetition owner and that the new cash infusion is not cancelled but rather is to be distributed as cash on hand. But this does not help the debtor here. In any event, the operation of Article IV only brings to light another barrier to confirmation, i.e., the unfair treatment of or discrimination among unsecured creditors. 11 U.S.C. § 1129(b)(1). Clearly, the plan treats Deci–Ma Corporation and Deci–Ma Management more favorably at HUD's expense because of the connection to Harvey's wife and brother-in-law. Article IV preserves the equity interests and assets for insiders of the debtor. The meager 5% distribution, if any, on HUD's § 1111(b) unsecured deficiency claim, given the full payment of Deci–Ma Corporation's and Deci–Ma Management's unsecured claims, clearly suggests from our perspective, as it did from the perspective of the courts below, that this plan was the "three dollar bill." Such a plan, therefore, that unfairly discriminates among

unsecured creditors cannot be confirmed. See Aztec, 107 B.R. at 588–92.

## HUD'S NEGATIVE VOTE

■ The bankruptcy court also determined that the plan could not be confirmed over HUD's objection. Under Woodbrook's amended plan, HUD would receive roughly 5% of its $2.6 million unsecured claim over three years, or $130,000; Deci–Ma Management would receive all of its unsecured claim within a year; and, Deci–Ma Corporation would receive Woodbrook's cash flow available after debt service until paid in full. HUD refused to accept the plan. This plan could be "crammed down" HUD's throat if at least one impaired class [10] of creditors accepted the plan, not counting the acceptance by an insider. 11 U.S.C. § 1129(a)(10).

The difficulty here is that the only other impaired classes are Class 5 (Deci–Ma Management) and Class 6 (Deci–Ma Corporation). Charles Harvey, one of the debtor's partners, has a beneficial interest in both Deci–Ma Corporation and Deci–Ma Management. Charles Harvey's wife owns 48% of the capital stock in Deci–Ma Corporation and the "principal" of Deci–Ma Management is Harvey's brother-in-law. The definition of "insider" under the Bankruptcy Code § 101 is "extremely broad." 5 COLLIER ON BANKRUPTCY ¶ 1129.02, at 1129–35. Where the debtor is a partnership, insiders include "relatives of a general partner in, general partner of, or person in control of the debtor." 11 U.S.C. § 101(31)(C)(ii). Any affirmative vote from Deci–Ma Corporation and Deci–Ma Management must be discounted as an insider vote. Thus, as the bankruptcy court found, confirmation cannot be achieved over HUD's objection. Dismissal of Woodbrook's Chapter 11 case, under these circumstances, was in the creditor's best interest. See Lumber Exchange, 968 F.2d at 650 (dismissal is in the creditor's best interest where § 1111(b) claimant can block any plan that does not pay its claim in full and debtor comprised a single real estate asset).

of substantiality where the disparity between the proposed cash infusion and unsecured debt is so extreme. See Snyder, 967 F.2d at 1132.

10. A class is impaired if there is "any alteration of a creditor's rights, no matter how minor." In re Windsor on the River Assocs., Ltd., 7 F.3d 127, 130 (8th Cir.1993).

### DENIAL OF OPPORTUNITY TO AMEND PLAN

Finally, Woodbrook insists that any defects in the plan can be cured by amendment and that its offer to submit a plan paying HUD's claim in full plus interest renders dismissal for inability to effectuate a plan improper. "Chapter 11 provides a reasonable opportunity for corporate reorganization[;] it does not guarantee reorganization nor does it permit an indefinite suspension of creditors' rights and remedies pending the unsuccessful attempts of any party to effect a reorganization of debt." *In re BGNX, Inc.,* 76 B.R. 851, 853 (Bankr.S.D.Fla.1987) (in view of time elapsed and failure of proponents to obtain consent of United States, court converted Chapter 11 case to Chapter 7 liquidation after second proposed plan was unconfirmable). A special aspect of the practice of bankruptcy is that it functions on a fluid set of facts, *i.e.*, the plan can always be changed. And, for the most part, bankruptcy courts permit the parties to submit numerous and alternative plans. Yet, bankruptcy courts are given a great deal of discretion to say when enough is enough.

Woodbrook was afforded an opportunity to amend its original plan. Woodbrook filed an amended plan two months after filing the original plan and ten months after filing for bankruptcy. The amended plan was substantially similar to the original plan. Essentially, Woodbrook had taken two bites at the apple and each time took a risk in formulating a plan that bordered on the fine line of unfair discrimination and feasible reorganization. The new amendment, Woodbrook's third bite at the apple, simply proposes to pay HUD's unsecured claim in full.[11] This amendment looks less like an honest effort to devise an acceptable plan and more like a death-bed conversion, particularly where the proposed amendment is vague on important details such as funding for the plan. Under the circumstances, we find that the bankruptcy court did not abuse its discretion in denying Woodbrook an opportunity to amend the plan a second time. *See Hall,* 887 F.2d at 1044–45 (bankruptcy court did not abuse discretion in dismissing Chapter 11 case under § 1112(b)(2) and in not considering remedies other than dismissal "where the debtor's failure to file an acceptable plan after a reasonable time indicated its inability to do so").

Other arguments were raised to support reversal. We have considered each of them but none is persuasive or worthy of discussion in this opinion. Furthermore, because we conclude that dismissal under § 1112(b)(2) was justified, we need not address Woodbrook's assignment of error with respect to dismissal under § 1112(b)(3).

For the foregoing reasons, the judgment of the district court affirming the bankruptcy court's dismissal of the debtor's bankruptcy case is AFFIRMED.

---

11. In the Rule 9023 motion, Woodbrook proposed to pay HUD's claim "in the amount of $6,208,273.24 at the rate of 8% per annum in level monthly payments commencing 30 days after confirmation at an amortization rate of 40 years, with the balance payable in 30 years ...

[A]ccumulated net rentals on hand, except for an amount necessary for working capital, satisfaction of expenses of administration and payment of small general claims shall be paid over to HUD for application to the principal amount of its claim."