**In re WATERVILLE VALLEY TOWN SQUARE ASSOCIATES, Limited Partnership, Debtor.**

**Bankruptcy No. 95–11799–MWV.**

United States Bankruptcy Court,
D. New Hampshire.

April 16, 1997.

---

**3.** Mass.Gen.Laws Ann. ch. 231, § 59H provides, in pertinent part:

> In any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition under the constitution of the United States or of the commonwealth, said party may bring a special motion to dismiss. The court shall advance any such special motion so that it may be heard and determined as expeditiously as possible. The court shall grant such special motion, unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) that the moving party's acts caused actual injury to the responding party....
>
> . . .
>
> If the court grants such special motion to dismiss, the court shall award the moving party costs and reasonable attorney's fees, including those incurred for the special motion and any related discovery matters....

Geraldine Karonis, Assistant U.S. Trustee, Manchester, NH, for UST J. Christopher Marshall.

M. Elaine Beauchesne, Sanders and McDermott, Hampton, NH, for Creditor Sanders and McDermott.

J. Michael Deasy, Deasy & Dwyer, PA, Nashua, NH, for Debtor Waterville Valley Town Square.

Bruce A. Harwood, Sheehan, Phinney, Bass and Green, Manchester, NH, for Creditor Sheehan, Phinney, Bass and Green.

Geraldine B. Karonis, Assistant U.S. Trustee, Manchester, NH, for United States Trustee J. Marshall.

J. Christopher Marshall, United States Trustee.

Paul D. Moore, Choate, Hall & Stewart, Boston, MA, for Creditor Fleet Real Estate Capital, Inc.

Michael C. Moyers, Cleveland, Waters & Bass, Concord, NH, for Creditor Ali, Inc.

Michael C. Moyers, Cleveland, Waters & Bass, Concord, NH, for Creditor Atlantic Bank & Trust Company.

Michael C. Moyers, Cleveland, Waters & Bass, Concord, NH, for Creditor Fleet Real Estate Capital, Inc.

NH Electric Cooperative, Plymouth, NH, Creditor.

Lon E. Siel, Concord, NH, for Creditor Dept. of Employment Sec.

Daniel W. Sklar, Peabody & Brown, Manchester, NH, for Debtor Waterville Valley Town Square.

### MEMORANDUM OPINION

MARK W. VAUGHN, Bankruptcy Judge.

The Court has before it the confirmation of the Chapter 11 plan of Waterville Valley Town Square Associates, Limited Partnership ("Waterville Valley Town Square" or "Debtor"). The Debtor filed for Chapter 11 relief on July 26, 1995. On September 20, 1995, the Debtor filed a plan of reorganization and a disclosure statement. On October

24, 1995, the Debtor filed its first amendments to these documents. On November 7, 1995, the Court held a hearing on the adequacy of the disclosure statement. As a result of the hearing, the Debtor filed a second amended plan and a second amended disclosure statement on November 13, 1995. The Court approved the second amended disclosure statement on November 17, 1995, and scheduled a hearing on confirmation for December 14, 1995. At that hearing, the Court continued confirmation until February 1996. The Court held hearings on confirmation on February 1, February 5, April 10, and April 22, 1996. Various motions and objections were filed by the main parties in this bankruptcy, the Debtor and Fleet Real Estate Capital, Inc., as attorney for Ali, Inc. ("Fleet"), the Debtor's largest secured creditor. The motions and objections include an objection to the plan's classification, a motion to determine that the plan does meet good faith standards, a motion for disqualification of votes, a motion for order establishing procedures for auction of equity, and a motion to dismiss.

For the reasons set out below, the Court denies confirmation of the plan.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## FACTS

Waterville Valley Town Square is a limited partnership whose only assets are a mixed use property in Waterville Valley, New Hampshire, which contains commercial/retail space on the first floor, commercial office space on the second floor, and thirty-three furnished residential apartments on the third floor, and personal property consisting of utility deposits, amounts due from tenants, and office equipment, furniture, and supplies. Thomas A. Corcoran and WVTS, Inc. are the general partners of the Debtor, holding a twenty percent and a thirty percent partnership interest respectively. WVTS, Inc. is a wholly owned subsidiary of Waterville Company, Inc., an entity that filed for bankruptcy itself in 1994. (Bk. No. 94–11477–MWV.) Limited partners of the Debtor are W.V. Mountain Center Assoc., Black Diamond Realty Trust, J. Richard Corley, and Raymond C. Pecor, Jr. W.V. Mountain Center Assoc. holds a twenty-five percent partnership interest. The other limited partners each hold an eight and one-third percent interest in the Debtor.

The Debtor's largest creditor is Fleet. Fleet is owed over eight million dollars. It holds a first mortgage in the amount of $5,519,644.47 and a second mortgage in the amount of $3,046,302.70. The Town of Waterville Valley has a claim for over $11,000 in water and sewer charges. The other creditors of the Debtor hold unsecured claims in the approximate amount of $77,000. These creditors are Associates of Glens Falls, Inc., New Hampshire Electric Cooperative, Sheehan Phinney Bass + Green, Snowy Owl Inn, Waterville Company, Inc., Sanders & McDermott, Waterville Ski Area Ltd., Central Paper Products Company, NYNEX, American Hotel Register Co., and Otis Elevator. Fleet has purchased and obtained assignments of the above claims with the exception of the claims of Waterville Company, Inc., Waterville Ski Area Ltd., Sheehan Phinney Bass + Green, and Sanders & McDermott.

The Debtor's plan of reorganization has four classes. Class 1 consists of the claim of the Town of Waterville Valley. Class 2 consists of the claim of Fleet. Classes 3 and 4 consist of the claims of the unsecured creditors. Class 5 consists of the partnership interests. Pursuant to the plan, the Town of Waterville will be paid in full on the effective date of the plan, except for accrued interest which the town waived.

The plan provides for the bifurcation of Fleet's claim. In the Debtor's opinion, the Waterville Valley Town Square complex is worth $1,600,000. Accordingly, Fleet has an unsecured claim in the amount of approximately $7,000,000. Under the plan, the Debtor gave Fleet two treatment options. Option A provides for the repayment of the

secured claim of $1,600,000 in five years, and, in the event that the Debtor elects to convert some of the residential units into condominiums prior to complete repayment, Fleet would remit seventy-five percent of the net sales proceeds to Fleet until paid in full. Option B provides for the repayment of the secured claim by paying Fleet $1,050,000 in five years and by giving title to the residential units to Fleet so that it can convert them into condominiums. Pursuant to the plan, Fleet had until the end of the valuation testimony to elect Option B, which Fleet did. Under both options, Fleet will receive a pro rata distribution of $95,000 along with the other unsecured creditors in Classes 3 and 4, on account of its unsecured claim of approximately $7,000,000. This amounts to a 1.3% dividend to unsecured claimants.

Under the plan, the Debtor's partners, Class 5, will have their partnership interests canceled on the effective date of the plan. New partnership shares will issue to the former limited partners and a new entity known as TAC Realty Management Corporation.

After reviewing the plan, Class 1, the Town of Waterville Valley, voted to accept the plan. Fleet rejected it on behalf of Ali, Inc. and all of the claims assigned to it in Classes 3 and 4. Sheehan Phinney Bass + Green voted in favor of the plan as did all members of Class 5, the Debtor's partners.

## DISCUSSION

Because not all impaired creditors voted in favor of the plan, the Court must find that the plan complies with 11 U.S.C. § 1129(b), in addition to 11 U.S.C. § 1129(a), in order to confirm the plan. This requires that the Court make a determination of the value of Fleet's secured claim. In addition, if the absolute priority rule applies, the Court must determine whether or not there is a new value exception and whether or not the Debtor's plan meets it. The Court must also address the other issues raised by the parties in their various motions and objections.

### I. CLASSIFICATION

The first objection to confirmation raised by Fleet was that the plan does not meet the requirement of 11 U.S.C. § 1129(a)(1) because the plan contains improper classifications. Section 1122 of the Bankruptcy Code provides that (1) a claim or an interest may be placed in a particular class "only if such claim or interest is substantially similar to the other claims or interests of such class," and (2) a plan may designate an administrative convenience class if it is reasonable and necessary. 11 U.S.C. § 1122. Fleet objected to the Debtor's classification scheme on three grounds: (1) Fleet's unsecured claim was classified separately from the general unsecured claims; (2) the unsecured claims were placed into a general unsecured claim class and an administrative unsecured claim class; and (3) Fleet's unsecured claim and secured claim were placed in the same class.

■ In response to Fleet's objection, Waterville Valley Town Square amended its plan so that all unsecureds would be treated the same, i.e., the general unsecureds' claims, Fleet's unsecured claim, and the small administrative unsecured claims would be treated the same. *See* Ct. Doc. No. 98. The Court finds that this completely addresses the first and second grounds of Fleet's objection. Fleet also argues that the lumping of its two claims into one class violates *Granada Wines*. *See Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund*, 748 F.2d 42 (1st Cir.1984). In response, the Debtor argues that Fleet could have cast two ballots, one on behalf of the unsecured claim and one on behalf of the secured claim, in accordance with Federal Rule of Bankruptcy Procedure 3018. According to the Debtor, that right is sufficient to deal with the issue. The Court finds that it need not address the issue because Fleet's unsecured claim is treated like all other unsecured claims, and even if Fleet had cast a second ballot, the case would have reached the cramdown stage since the Court ruled at the February 1, 1996 hearing that one impaired class, Class 1 containing the claim of the Town of Waterville Valley for water and sewer charges, had voted in favor of the plan.

### II. DISQUALIFICATION OF VOTES

■ Waterville Valley Town Square filed a motion pursuant to 11 U.S.C. § 1126(e) to

disqualify votes cast by Fleet on behalf of claims purchased by and assigned to Fleet. Section 1126(e) provides that, "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with provisions of this title." This section specifically authorizes the Court to designate and disqualify votes by any entity whose acceptance or rejection was not in good faith.

 Fleet solicited an assignment of claims from all unsecured creditors unrelated to the Debtor. On November 8, 1995, Fleet filed a notice of transfer of claims pursuant to Federal Rule of Bankruptcy Procedure 3001(e)(1), (2). The claims that were assigned to Fleet are the claims of Central Paper Products, NYNEX, American Hotel Register Co., Associates of Glen Falls, Inc., New Hampshire Electric Cooperative, and Snowy Owl Inn. Fleet acknowledges that it purchased these claims in order to block confirmation of the Debtor's plan.

The majority view is that it is permissible for a creditor to purchase claims and vote them in accordance with the creditor's interest *as a creditor. See, e.g., In re Gilbert,* 104 B.R. 206, 217 (Bankr.W.D.Mo.1989). A problem arises when a creditor purchases claims in a manner that advances a *noncreditor* interest, e.g., to gain control of the debtor's operation. In *In re Marin Town Center,* 142 B.R. 374, 380 (N.D.Cal.1992), the court held that, "[t]he mere purchase of claims to block confirmation of a plan does not constitute bad faith."

Two of the cases relied upon by Waterville Valley Town Square in support of its position, *In re Allegheny Int'l, Inc.,* 118 B.R. 282 (Bankr.W.D.Pa.1990), and *In re Applegate Property, Ltd.,* 133 B.R. 827 (Bankr. W.D.Tex.1991), involve situations in which the creditors purchased claims in order to block confirmation of the debtor's plan *and to promote confirmation of their own plan.* As Judge Queenan's treatise explains, "a party who is a plan proponent should be prohibited from purchasing claims because of the inconsistency between the payments made in the purchases and the payments proposed under the plan." James F. Queenan, Jr. et al., *Chapter 11 Theory and Practice* § 30.25 (1994). Here, Fleet has not proposed its own plan, and thus, it did not seek to promote confirmation of its own plan when it solicited and voted the claims of other unsecured creditors.

 The Debtor argues that the votes should be disqualified because Fleet did not solicit and purchase the claims of *all* unsecured creditors. Fleet acknowledges that it did not solicit or purchase the votes of entities related to the Debtor, namely Waterville Company, Inc. and Waterville Valley Ski Area, Ltd. Fleet indicated that it did not believe that such entities would assign their claims. The Court finds that Fleet's reason for not soliciting the claims of related entities is reasonable and does not exhibit bad faith.

 The Debtor also argues that because the ballots did not indicate that Fleet was voting the assigned claims as *attorney in fact of Ali, Inc.,* these ballots should be disqualified. The Court finds that the Debtor was fully aware that Fleet was purchasing claims and knew that Fleet *as attorney in fact of Ali, Inc.* was casting the ballots in question. In fact, the Debtor filed its motion for disqualification on December 5, 1995, days before the ballots in question were even cast. *See* Exs. 2 and 3 (ballots cast on behalf of Central Paper Products, NYNEX, American Hotel Register Co., Associates of Glens Falls, Inc., Snowy Owl Inn, and New Hampshire Electric Cooperative, were signed on December 7, 1995 and the ballot cast on behalf of Otis Elevator was signed December 11, 1995). The Court finds that this technicality will not result in the disqualification of these votes.

Overall, the Court is convinced that Fleet voted out of a legitimate concern to protect its interest as a creditor. For some time, Fleet has argued that the Debtor's plan grossly undervalues its secured claim by using a value of $1.6 million. As the holder of approximately ninety-nine percent of the Debtor's total debt, Fleet sought to exercise as much power in the voting process as it could. Fleet believes that consummation of the plan will be more harmful to its invest-

ment than liquidation, a position which Fleet has taken consistently as evidenced by its motion for relief filed in 1995 and its fifteen months of negotiation with the Debtor. *See In re Marin Town Center*, 142 B.R. at 379 (citing *In re Pine Hill Collieries Co.*, 46 F.Supp. 669, 671 (E.D.Pa.1942) (finding no bad faith in withholding consent because creditor believes plan is "injurious to its investment")). Accordingly, the Court finds that Fleet's actions meet the standard of good faith and the votes will not be disqualified pursuant to section 1126(e).

## III. DETERMINATION OF GOOD FAITH

Fleet filed a motion for a determination that the plan does not meet the good faith requirement of 11 U.S.C. § 1129(a)(3) because the claim of the Town of Waterville Valley is artificially impaired. At the February 1 hearing, the Court found that the town's claim was impaired. Accordingly, the argument that the claim was artificially impaired is moot. The Court also finds that the Debtor has shown that the plan has been proposed for the legitimate and honest purpose of reorganization. Therefore, under the facts of this case, the good faith requirement of section 1129(a)(3) is satisfied.

## IV. VALUE OF FLEET'S SECURED CLAIM

As indicated above, Waterville Valley Town Square consists of both residential and commercial units. In order to determine the value of Fleet's secured claim, the Court must first make a finding as to the highest and best use of the residential portion of the property, and once having made that finding, the value of the residential portion. The Court must then determine the value of the commercial portion in order to arrive at the total amount of Fleet's secured claim.

### A. Residential Property

At trial, both the Debtor and Fleet provided expert appraisal testimony on value. The Debtor's expert, Donald P. Bouchard of R.M. Bradley and Co., Inc., testified that the highest and best use of the residential property was its present use as rental units and valued this portion of the property at $566,-516. Fleet's expert, Jonathan H. Frank of F & M Appraisal Group, Inc., testified that the highest and best use was the property converted to condominiums and valued the property, as converted, at $1,910,000.

Both experts agreed that the applicable definition of highest and best use is that found in the Appraisal Institute's *The Dictionary of Real Estate Appraisal*, (3d ed. 1993), which defines it as: "The reasonably probable and legal use of vacant land or an improved property which is physically possible, appropriately supported, financially feasible and results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability." Both experts also agreed that the first two criteria were met; that is, the conversion to condominiums is both legally permissible and physically possible. This conclusion was supported by Fleet's witness, Attorney Michael Ruedig, a lawyer specializing in this type of real estate work.

On the requirement of financial feasibility, the experts disagreed. Bouchard opined that it is not financially feasible to convert to condominiums at this time and, thus, the continued use as rental apartments is the highest and best use. Frank, on the other hand, opined that the apartments could be converted and sold as condominium units over a period of two years at a price of $80,000 per unit. Having opined that the condo conversion was financially feasible, Frank then concluded that the conversion would create the maximum profitability and, thus, the conversion to condominiums was the highest and best use.

The Court agrees with the Debtor's expert for the following reasons. First, based on the recent history of condo sales in Waterville Valley, the absorption rate of thirty-three units in twenty-four months is unrealistic. Mr. O'Hara, president and general manager of Waterville Valley Realty, whose company handles virtually all of the sales in Waterville Valley, testified that for the fiscal year 1995, there were forty-one booked sales, including condos, homes, land, and house lots. He further testified that as of February 2, 1996, there were 172 properties of all

types listed in Waterville Valley, including 157 condominiums. He further testified that the Waterville Valley Town Square condo proposal was on the low end of the price range of condos in the valley and that virtually all of the other comparable condos had nicer amenities, including fireplaces, storage lockers, easy access and pools and/or health clubs. It is uncontradicted that the primary access to the residential units is through a main elevator to the second floor followed by a walk down various hallways and a trip up two flights of stairs.

Second, there was testimony as to the availability and the cost of financing both to an investor in the entire thirty-three units and also to the end purchaser. Donald Evans, a local banker familiar with this type of financing, testified that because of the mixed use of residential and commercial units, the financing would fall outside the parameters of a conventional loan and would require excessive debt coverage and most likely binding pre-sales of some or all the condominium units. In this regard, Mr. O'Hara testified that the only planned condominium project in the Waterville Valley area over the past number of years has been delayed for some time due to its inability to obtain binding pre-sales of the units. Mr. Evans further testified that because of the nonconforming nature of the project, mortgage insurance found in the secondary market would not be available to the end user requiring the purchaser of a unit to invest twenty-five to thirty percent of the unit's price in order to obtain financing.

Finally, questions were raised at trial as to the acceptability by the public of the units themselves. Being in close proximity to and above commercial space including restaurants and lounges would reduce the potential market for these units. Since the complex does not have recreation facilities like some of the others, membership in the recreation facility would probably be a requirement, either costing the potential purchaser between $2,900 and $4,500 or, as a practical matter, reducing the price of each unit by that amount. In addition, the access problem raises considerable doubt as to the units' acceptability.

For all of the above reasons, the Court finds that the conversion to condo units does not meet the financial feasibility requirement of the highest and best use and therefore conversion is not the highest and best use. With no other alternative before the Court, the Court finds that the continued use as residential apartments to be the highest and best use. As the Court has no evidence before it other than Mr. Bouchard's testimony as to the value of these units as residential apartments, the Court finds the value of the residential property to be $566,516.

### B. Commercial Property

█ Having found the value for the residential property, the Court must now find a value for the commercial property. Mr. Frank valued the commercial property at $1,875,000 and Mr. Bouchard valued it at $1,050,000, a significant difference of $825,000. Both appraisers used the income approach to determine value. The difference in the value is largely the result of Frank using contract rents of $469,511, which produces net operating income of $234,255, and Bouchard using actual rents paid of $226,000, which produces net operating income of $146,954. In addition, Frank used a more conservative capitalization ratio of 12.5% than Bouchard's 14%. The difference in vacancy reserves and expenses are insignificant for the Court's finding. Accordingly, the Court is faced with the questions of which set of rents, if any, to use and which capitalization ratio to use.

The Debtor argues that the actual rents are most appropriate and should be used. However, the evidence indicates that the actual rents are the result of negotiations over the past years in an effort to maintain the tenant base. Adjustments have been made, arrearages forgiven and, in some cases, only the percentage rent has been paid. On the other hand, Fleet argues that the contract rates are most appropriate, having tested them with rents in other locations including Settler's Green in North Conway, New Hampshire, Lincoln Square Outlet in Lincoln, New Hampshire, and Sugarloaf Mountain Hotel in Carrabassett, Maine. The Court finds that each of these comparable locations are significantly different from Wa-

terville Valley, especially the Lincoln, New Hampshire and North Conway, New Hampshire comparables, which have significantly different traffic counts as well as amenities.

■ In the context of confirming a Chapter 11 plan, the Court must determine the entity's going concern value. *Winthrop Old Farm Nurseries v. New Bedford Instit. for Savings (In re Winthrop Old Farm Nurseries)*, 50 F.3d 72 (1st Cir.1995) (concluding that courts should value property under section 506(a) "in light of the proposed post-bankruptcy reality" and holding that property retained for use by a Chapter 11 debtor should be valued at fair market). Given the history of the Debtor, the actual rents are too pessimistic and the contract rents are too optimistic. For purposes of confirmation, the Court finds the net operating income to be $190,000. The Court also believes, given the history of the Debtor, that the 12.5% capitalization rate used by Frank is unrealistic and adopts the 14% capitalization rate used by Bouchard evidencing a more risky investment. Using this net operating income and capitalization rate, the Court finds, for the purpose of confirmation, that the value of the commercial property is $1,357,142. Together, the commercial and residential properties produce a total value of $1,923,658, which the Court finds is the value of Fleet's secured claim.

## V. ABSOLUTE PRIORITY RULE AND AUCTION OF EQUITY

The Court has found that the Town of Waterville Valley, an impaired class, has voted to accept the plan, thus meeting the requirement for confirmation under section 1129(a)(10) of the Bankruptcy Code. The Court has also found that the unsecured classes of creditors have voted to reject the plan triggering section 1129(b)(2)(B)(ii), the absolute priority rule, if in fact, the holders of an interest in the Debtor will receive or retain under the plan on account of such interest any property. The Debtor argues that the current interest holders are not retaining any property under the plan since their partnership interests are being terminated and they are contributing new capital for the purchase of their limited partnership shares in the reorganized Debtor.

Pursuant to the plan, the partnership interests in the Debtor will be canceled on the plan's effective date. New partnership shares will be sold to some of the former partners. Waterville Valley Mountain Center Assoc., a former limited partner, will contribute $120,000 to obtain a limited partnership interest of forty-five percent in the Debtor. Black Diamond Realty Trust, J. Richard Corley, and Raymond C. Pecor, Jr., former limited partners, will each contribute $40,000 to obtain limited partnership interests of 14.16% each. These four parties were all limited partners of the Debtor, with Waterville Valley Mountain Assoc. holding a twenty-five percent interest and the other three partners each holding an eight and one-third percent interest. Pursuant to the plan, the Debtor's general partners, Thomas A. Corcoran and WVTS, Inc., will no longer hold any partnership interests in the Debtor. Prior to the bankruptcy, they together held a fifty percent partnership interest in Waterville Valley Town Square. A new entity, TAC Realty Management Corporation, will be the new general partner of the Debtor. This corporation will obtain a fifteen percent partnership interest over a five year period "in exchange for its agreement to serve as the sole general partner and to manage and market the Debtor's Premises for a period of five (5) years without additional compensation other than reimbursement for its actual out-of-pocket expenses incurred for the direct benefit of the partnership." The plan further provides that ownership of this fifteen percent shall be "contingent upon the general partners faithful performance and consequently, a three percent (3%) partnership interest shall vest outright in the general partner on each anniversary date."

■ On the issue of whether current partners are receiving or retaining any property on account of their interest in the Debtor, the Court agrees with Fleet that the cancellation of the old partnership shares and the issuance of new shares is form over substance. With the exception of the new general partner, TAC Realty, the holders of the new limited partnership shares are the

same as the partners in the Debtor, although in different amounts. There is no evidence before the Court that these limited partnership shares were offered to any other person or entity other than the current partners. If nothing else, this exclusive right to participate is property on account of their current interest in the Debtor. *See In re Outlook/Century Ltd.,* 127 B.R. 650, 653–54 (Bankr.N.D.Cal.1991) (citations omitted); *but see Bonner Mall Partnership v. U.S. Bancorp Mortgage Co.,* 2 F.3d 899, 910–11 (9th Cir.1993). The Court finds that in order for the plan to be confirmed, the absolute priority rule must be satisfied.

■ Having found that the absolute priority rule applies and having also found that the Debtor's limited partners are retaining property of value, the Court is faced with the question of whether what is commonly referred to as the "new value exception" to the absolute priority rule exists, and if so, whether the Debtor has met its burden under that exception to the rule. Without detailing the history of the exception to the absolute priority rule as many learned jurists have done including Judge Queenan in *In re Bjolmes Realty Trust,* 134 B.R. 1000, 1004–08 (Bankr. D.Mass.1991), *see also In re Woodbrook Assocs.,* 19 F.3d 312, 319–320 (7th Cir.1994); *Bonner Mall,* 2 F.3d at 907–17; and *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII),* 961 F.2d 496, 503–04 (4th Cir.1992), the Court finds that the new value exception to the absolute priority rule does, in fact, exist.

■ Cases applying the new value exception find that the interest retained must be "reasonably equivalent to the contribution," *Case v. Los Angeles Lumber Prods. Co.,* 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939), or "substantial," *In re U.S. Truck Co., Inc.,* 800 F.2d 581, 588 (6th Cir.1986). However, there is no specific formula in the Bankruptcy Code or in the cases for valuing the contribution. *Woodbrook Assocs.,* 19 F.3d at 320 (explaining that whether the infusion of new capital is substantial "is more a common sense determination than a mathematical calculation when the debtor comprises only a single real estate asset which is fully encumbered").

■ In the instant case, Fleet has filed a motion to have the Court order a bidding process to determine the true value of the retained interest in the Debtor. This is the procedure advocated by Judge Queenan in the *Bjolmes* case where he ordered an auction of the stock interest to be held between the shareholders, the secured creditor and any other creditor to determine the "actual market value" of the equity interest in the debtor. *Bjolmes,* 134 B.R. at 1010. While this method has been followed by some, the Court finds the reasoning of Judge Ginsburg in *In re SM 104 Ltd.,* 160 B.R. 202 (Bankr. S.D.Fla.1993), to be more persuasive on the facts of this case.

■ First, the plan that is before the Court on confirmation is the Debtor's plan. Unlike the court in *Bjolmes,* it is the belief of this Court that it is the Court's duty to confirm or deny confirmation of the plan that is before the Court and to not modify the plan by court fiat. The effect of an auction under this plan, as argued by both the Debtor and Fleet, is that any increase in the value of the equity interest as a result of the bidding process inures to the benefit of the Debtor and not the creditors. Because Fleet is the holder of approximately ninety-nine percent of the debt, Fleet is the obvious beneficiary of any increase in value. This is true even though both the Debtor and Fleet agreed that there could not be a credit bid by Fleet. The result is that ninety-nine percent of any increase would go from one Fleet pocket to another.

Second, Fleet has had ample opportunity to request a termination of exclusivity and file a plan of its own if it so desired. There is little question that Fleet has consistently and aggressively participated in this case, including the purchase of the claims of virtually every non-insider creditor in the case in order to defeat confirmation. The Court agrees with the Debtor that to utilize the bidding process at this stage of the reorganization would most likely provide Fleet with its goal, i.e., the property, without having to comply with the Bankruptcy Code's disclosure and voting requirements relating to a plan of reorganization.

Finally, the Court believes that on the facts of this case, the bidding procedure would not reflect the true value of the equity interest in the Debtor but only an indication of Fleet's desire to acquire the premises outside of the plan process. For these reasons, the Court denies Fleet's motion for a bidding process.

■ Thus, the Court is faced with the question of whether the contribution in this case is essentially equivalent to the equity interest being retained or is substantial. The Debtor's plan, which values the property at $1,600,000, proposed an immediate infusion of $240,000 or fifteen percent of the property's value. This contribution is immediate and without conditions. The Court has found that the value of the asset is $1,923,-658. This higher value will require a greater debt service payment under the proposed plan should the Debtor decide to modify it. Although Fleet's unsecured deficiency claim will be reduced, the Court finds any reduction insubstantial based on the 1.3% dividend to unsecured creditors under the plan.

Because the value of Fleet's secured claim equals the value of the property, $1,923,658, as determined by the Court using the income approach, there is no equity in the Debtor and no current value for the limited partners. It is the Court's belief that the limited partners are making their contribution, not based on today's value of the asset, but because of their historic investment in Waterville Valley Town Square and their belief in its future. Based on the fact that there is no apparent value to the equity retained, the Court finds that a contribution of fifteen percent of the property's value, as determined by the Court, is both substantial and reasonably equivalent to the partners' equity interest. Therefore, a contribution of fifteen percent of $1,923,658, or $288,548.70, would meet the new value exception to the absolute priority rule.

## CONCLUSION

The Court finds that the Debtor's plan meets the requirements of 11 U.S.C. § 1129(a)(1), as the plan does not contain improper classifications. It also meets the good faith requirement of 11 U.S.C. § 1129(a)(3). The Court declines to disqualify votes cast by Fleet on behalf of claims purchased by and assigned to Fleet.

■ Although the Court finds that the plan does not violate the absolute priority rule contained in 11 U.S.C. § 1129(b)(2)(B)(ii), confirmation is denied as the plan fails to provide Fleet the full value of its secured claim in Waterville Valley Town Square of $1,923,658, the sum of the values of the residential portion, $566,516, and the commercial portion, $1,357,142.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate order consistent with this opinion.