59 F.3d 170
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 In re MARK BENSKIN & COMPANY, INC., Debtor.
George W. Emerson, Jr., Trustee, Plaintiff-Appellee,
v.
Ray MAPLES and Brenda Maples, Defendants-Appellees,
Marnie Fernandez, Executrix of the Estate of Beverly Poston,
Intervening Defendant-Appellant (94-5421)
Donald Rutherford, Intervening Defendant-Appellant (94-5422).
 Nos. 94-5421, 94-5422.
 United States Court of Appeals, Sixth Circuit.
 June 26, 1995.
 
 Before: JONES and BATCHELDER, Circuit Judges, and JOINER, District Judge.*
 PER CURIAM.
 
 
 1
 Intervening Defendants Marnie Fernandez, executrix of the estate of Beverly Poston, and Donald Rutherford are appealing the bankruptcy court's and the district court's decisions to award the trustee of Mark Benskin & Company, Inc.'s estate, money that Benskin ("Debtor") fraudulently obtained from the intervenors in a classic Ponzi scheme.[1] Subsequently, Benskin paid the money to Ray and Brenda Maples and Donald and Catherine Hollie, who were also investors, shortly before involuntary bankruptcy petitions were filed against Benskin and his company. The intervenors contend that the lower courts erred in their determination that the trustee had a superior right to the funds in question. Moreover, the intervenors argue that the lower courts' refusal to grant the intervenors' motions for summary judgment was an abuse of discretion. We affirm the decisions of the lower courts.
 
 I.
 
 2
 In 1986, Mark Benskin established an insurance brokerage and investment commodity business known as Mark Benskin & Company.[2] The main emphasis of the business was investments. Clients would invest money with Benskin in the hope of obtaining a good return on the investments Benskin promised to make on their behalf. Benskin invested his clients' money in the stock market and in mutual funds. He would then send his clients monthly reports reflecting any gains or losses on their money.
 
 
 3
 To operate his business, Benskin set up two bank accounts. One account was simply an "operating account" out of which Benskin paid company-related expenses such as rent and electricity. The second account was an "escrow account" at the National Bank of Commerce into which all client money was deposited and from which all investments were made. To pay for any stocks or securities purchased for his clients, Benskin transferred funds from the escrow account to general accounts in the name of Mark Benskin & Co., maintained at brokerage houses, Merrill Lynch and McClarty & Co., or to the general account Benskin maintained in a mutual fund that was known as American Capital. Further, to pay clients returns on their investments, Benskin distributed funds from this same escrow account. Benskin did not establish individualized client accounts at either of the brokerage houses or with the mutual fund.
 
 
 4
 Benskin testified, however, that he treated a limited number of "restricted" funds (such as IRA or Keough funds) differently by keeping those funds segregated and intact. With such restricted funds, Benskin established a separate account at American Capital in the name of the client. In all other transactions, Benskin deposited the client's money into the escrow account and subsequently transferred it to his general accounts at American Capital or the brokerage houses.
 
 
 5
 In the beginning, Benskin may have actually invested some of the unrestricted money as he had promised. At some point in 1987, however, Benskin began to create a shortfall in the escrow account due to his personal withdrawals. Furthermore, through false statements, Benskin promised fictitious profits to his clients. In order to fund the shortfall, Benskin decided to pay the old clients' profits with the new clients' money.
 
 
 6
 The number of Benskin's clients continued to increase until early 1989. At that time a run on the bank started as more and more clients began demanding larger amounts of money. In an effort to delay the inevitable discovery of his fraud, Benskin distributed all funds in his escrow account in early 1989. Due to the amount that he had previously disbursed to himself,[3] however, and the enormous profits he had promised, Benskin's scheme was discovered. Benskin was arrested in April 1989. He confessed to the F.B.I. and was later indicted by a federal grand jury and plead guilty to a fifty count indictment for mail fraud and securities fraud. This court affirmed Benskin's ten year sentence. United States v. Benskin, 926 F.2d 562 (6th Cir. 1991).
 
 
 7
 Shortly thereafter, on April 14, 1989, involuntary bankruptcy petitions for Mark Benskin individually, and Mark Benskin & Company, Inc. were filed. George Emerson was appointed trustee, and he filed adversary proceedings against all of Benskin's clients, who had withdrawn any money within the last ninety days, and against those clients, who had withdrawn "profits" within the last year prior to the filing date.
 
 
 8
 Among those proceedings was the trustee's fraudulent conveyance action against Brenda and Ray Maples pursuant to 11 U.S.C. Sec. 548. According to Benskin's records, the Maples withdrew $53,100 in "profits" during the one-year period preceding the bankruptcy filing. So the trustee alleged that Maples received $53,100 in fraudulent transfers from Benskin. The Maples filed an answer denying that the funds were fraudulent transfers. Beverly Poston[4] intervened in this proceeding and filed a motion for summary judgment because she had deposited $137,150.34 with Benskin a few days before Benskin gave the Maples $33,100 in profits. Poston alleged that the Maples' profit payment was money that Benskin stole from Poston. See Benskin, 926 F.2d at 563 ("In a further effort to conceal the fraud, Benskin issued checks (to quell any investor suspicion) to investors that requested a portion of their purported investment profits; Benskin often used money misappropriated from later investors to fund these payments."). Poston testified that she told Benskin she wanted her money invested in treasury bills. Benskin stated that Poston did not tell him specifically how to invest her money.
 
 
 9
 The bankruptcy court did not rule immediately on Poston's summary judgment motion. Instead, the court held a trial on November 12, 1993, and at the conclusion of the proof, the bankruptcy court denied Poston's Motion for Summary Judgment in an oral ruling. J.A. at 78. Subsequently, the court issued a final opinion on December 7, 1993. The court ruled that the trustee was entitled to a judgment against the Maples in the amount of $53,100 plus interest, and the court also denied Poston's complaint against the Maples and the bankruptcy estate. Poston appealed and the district court affirmed the bankruptcy court's decision on February 22, 1994.
 
 
 10
 The trustee also brought an adversarial proceeding, pursuant to 11 U.S.C. Secs. 547, 548 against Donald and Catherine Hollie. The complaint alleged that the Hollie's withdrew $65,509.53 in "profits" from Benskin either as a preference or a fraudulent transfer within ninety days prior to the filing of bankruptcy. The Hollies filed an answer denying that the funds were either a preference or a fraudulent transfer.
 
 
 11
 Donald Rutherford, another Benskin client, intervened in this action because Rutherford had deposited $50,000 with Benskin a few days before the Hollies' withdrawal of $65,569.63. Rutherford alleged that Benskin stole Rutherford's $50,000 and gave those stolen funds to the Hollies. As a result, Rutherford claimed that the trustee was not entitled to recover for the benefit of the bankruptcy estate the funds that Benskin stole from him and gave to the Hollies. Benskin stated that Rutherford did not tell him specifically how to invest his money. Rutherford testified that he told Benskin he wanted Benskin to deposit the funds in Rutherford's name with the American Capital Securities fund.
 
 
 12
 During the course of the proceedings, the Hollies were dismissed from the case when they essentially interpleaded $60,000 into an account with counsel for the trustee and Rutherford as joint trustees. This money remains in a separate account pending the outcome of this appeal.
 
 
 13
 Facing motions for summary judgment from both the trustee and Rutherford, the bankruptcy court granted Rutherford's motion for summary judgment and denied the trustee's motion. Thereafter, several motions were filed requesting the court to reconsider its decision. The bankruptcy court subsequently withdrew its previously filed opinion and set the case for trial. After the trial on November 15, 1993, the bankruptcy court issued an opinion finding that the trustee had proven its case under 11 U.S.C. Sec. 548 (fraudulent conveyance). The court also incorporated by reference its opinion in Emerson v. Maples, the related adversary proceeding, and adopted the legal conclusions and reasoning found in that opinion. Rutherford appealed to the district court, and the district court affirmed the bankruptcy court's decision.
 
 
 14
 The intervenors in Maples (No. 94-5421) and Hollie (No. 94-5422) are now appealing the adverse lower court decisions.
 
 
 15
 II. Who has priority over the contested funds?
 
 
 16
 In this case the trustee brought a fraudulent conveyance action against the Maples and the Hollies pursuant to 11 U.S.C. Sec. 548.[5] As a preliminary matter, the trustee's ability to force the Maples and the Hollies to reconvey the contested funds to the estate of the debtor hinges on the ability of the trustee to meet the requisites of section 548. The intervenors claim that "[t]he trustee failed to satisfy the statutory requirements to avoid the transfer of the stolen funds to defendants." Intervenors' Br. at 15. In each case, however, the bankruptcy court found that the trustee's proof was sufficient under both the section 548(a)(1) requirement that Benskin had actual intent to defraud his creditors and under the section 548(a)(2) requirements that (A) Benskin received less than a reasonable equivalent value for such transfer, and (B) that he (i) was insolvent on the date the transfer was made, (ii) was engaged in a business with unreasonably small capital, or (iii) believed that he would incur debts that would be beyond his ability to pay. J.A. at 48-50, 74, 242-243, 254. The factual findings of the bankruptcy court will not be set aside unless they are "clearly erroneous." Crocker v. Braid Elec. Co. (In re Arnold), 908 F.2d 52, 55 (6th Cir. 1990). The bankruptcy court's conclusions of law, however, are reviewed de novo. Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.), 898 F.2d 498, 499 (6th Cir. 1990).
 
 
 17
 We believe the district court correctly found, pursuant to section 548(a)(1), that when Benskin transferred funds to the Maples and the Hollies, he made the transfers with the actual intent to hinder, delay, or defraud his present or future creditors. In determining whether the debtor has the requisite intent, this court looks to the circumstances surrounding the transaction. United States v. Berman, 884 F.2d 916, 921-22 (6th Cir. 1989). One of the circumstances that unequivocally evidences fraudulent intent is the debtor's pursuit of a classic Ponzi scheme. Since 1966, this court has found that the question of intent to defraud in a Ponzi scheme "is not debatable."' Conroy v. Shott, 363 F.2d 90, 92 (6th Cir.), cert. denied, 385 U.S. 969 (1966). Other courts have also noted that an intent to defraud can be inferred as a matter of law from the mere fact that the debtor was running a Ponzi scheme:
 
 
 18
 One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.
 
 
 19
 In re Independent Clearing House Co., 77 B.R. 843, 860 (D. Utah 1987). Based on the facts presented at trial and the indictment to which Benskin pled guilty, the bankruptcy court had more than enough evidence to find that Benskin had the requisite intent to defraud his investors.
 
 
 20
 The intervenors argue, however, that in transferring funds to the Hollies and the Maples, Benskin only had the intent to defraud the intervenors and not the other creditors in general. Intervenor's Br. at 23. Yet, even if this is true, such intent brings the transfer within the purview of section 548(a)(1). The trustee need only show that when the debtor made the transfer, he intended to defraud any entity to which he was indebted. 11 U.S.C. Sec. 548(a)(1). Those persons, who invest on the eve of a Ponzi scheme's collapse, are entities to whom the debtor becomes indebted when they entrust their funds to him. Thus, if at the time Benskin made the transfers to earlier investors, like the Maples and the Hollies, he had the actual intent to defraud later investors, like Fernandez and Rutherford, then such transfers are fraudulent within the meaning of section 548(a)(1). See Independent, 77 B.R. at 860.[6]
 
 
 21
 Despite this evidence, the intervenors argue that because Benskin stole their funds and never had title to those funds, Benskin had no "interest" in the property that he could transfer, as required in section 548(a). Intervenors' Br. at 17. Without such a legal or equitable interest, they argue that the trustee could not avoid the transfers to the Hollies and the Maples and statutorily mandate the return of the stolen money to Benskin's estate.
 
 
 22
 The Bankruptcy Code does not define the phrase "interest of the debtor in property" as used in section 548, but the Supreme Court has noted that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." Butner v. United States, 440 U.S. 48, 55 (1979).
 
 
 23
 Turning, therefore, to Tennessee law, we find that the fundamental error in the intervenors' argument is that they ignore the significant distinction between obtaining the funds by theft and obtaining them by fraud. Tennessee law defines "fraud" as "the term is used in normal parlance" and it "includes ... deceit, trickery, misrepresentation, and subterfuge," Tenn. Code Ann. Sec. 39-11-106(13) (1991), and Tennessee law also states that a "person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent," Tenn. Code Ann. Sec. 39-14-103 (1991). With theft, the owner has no intention to part with his property, but in the case of fraud, the owner willingly entrusts his property into the hands of another for some purpose, unaware that he is being deceived.
 
 
 24
 Under Tennessee law, this subtle difference effects the status of the perpetrator's interest in the property. A person that steals property never divests the owner of title to his property, and the owner can follow and reclaim the stolen goods wherever he may find them. See Butler v. Buick Motor Co., 813 S.W.2d 454, 458 (Tenn. Ct. App.), cert. denied, 502 U.S. 911 (1991). Any subsequent purchasers of the stolen property simply receive void title because the thief had no title to pass. Id. A person that obtains property by fraud, however, acquires voidable title to the property, and pursuant to Tennessee law, can transfer a good title to a good faith purchaser for value. Id. at 457 (citing Tenn. Code Ann. Sec. 47-2-403). Thus, the perpetrator of fraud obtains some legally cognizable interest in the property under Tennessee law, a voidable or defeasible title.
 
 
 25
 We find that this legal interest under Tennessee law is sufficient to constitute an "interest of the debtor in property" for purposes of section 548(a). See In re Int'l Loan Network, Inc., 160 B.R. 1, 11 (Bankr. D.D.C. 1993) (holding that debtor's interest in property, which defendants asserted was non-existent because obtained by fraud, successfully met the requirements of section 548 because debtor nonetheless had a legally recognized interest in the property, a defeasible title).
 
 
 26
 The remaining question is really no question at all: whether Benskin's conduct constituted fraud or theft of property. The facts clearly indicate that Benskin deceitfully persuaded the intervenors to give him money for him to invest on their behalf. This constitutes fraud under Tennessee law.
 
 
 27
 Thus, Benskin did have an interest in the property, which he fraudulently obtained, and the trustee definitively established his statutory right under section 548(a) to avoid Benskin's fraudulent conveyances to the Maples and the Hollies.
 
 
 28
 Despite the foregoing conclusion, the intervenors contend, based on two separate grounds, that their right to the contested funds is superior to that of the trustee. First, the intervenors claim that when they gave money to Benskin for investment purposes, they created an express trust, which trumps the bankruptcy trustee's right to the avoided transfers. Second, the intervenors argue that because of Benskin's fraud, a constructive trust in favor of the intervenors should be imposed on the funds that were invested with Benskin, thereby precluding their inclusion in the bankruptcy estate.
 
 
 29
 A. An Express Trust?
 
 
 30
 Regarding the existence of an express trust, the intervenors correctly claim that a "debtor that served prior to bankruptcy as trustee of an express trust generally has no right to the assets kept in trust, and the trustee in bankruptcy must fork them over to the beneficiary." XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.), 16 F.3d 1443, 1449 (6th Cir. 1994); see also United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.10 (1983) ("Congress plainly excluded [from the bankruptcy estate] property of others held by the debtor in trust at the time of the filing of the petition."); id. at 204 n.8. Thus, if the intervenors could establish that they created an express trust when they gave money to Benskin for investment purposes, the money would be excluded from the bankruptcy estate of Benskin.
 
 
 31
 The bankruptcy court found that no express trust existed between Benskin and the intervenors. Although the court found that Benskin was acting in a fiduciary capacity as to the intervenors when he persuaded them to place funds with him for investment, the court did not find this proof sufficient to establish that an express trust was created. Moreover, the court held that the major impediments to a conclusion that an express trust existed were that Benskin did not segregate the funds entrusted to him, that he did not treat the funds as trust property prior to the bankruptcy filing, and that the funds of the intervenors were depleted from the escrow account prior to the bankruptcy filing. As such, there existed no identifiable trust res. See Kopsombut-Myint Buddhist Ctr. v. State Bd. of Equalization, 728 S.W.2d 327, 333 (Tenn. Ct. App. 1986) (noting that existence of trust requires proof of three elements: (1) a trustee who holds the trust property and who is subject to equitable duties to deal with it for the benefit of another; (2) a beneficiary; and (3) identifiable trust property).
 
 
 32
 The intervenors claim, however, that they can trace and identify their funds by applying the "first in, first out" rule, normally utilized in inventory contexts, to the bank's internal check posting methodology. Using this method, the intervenors offered proof allegedly identifying $33,100 of Poston's money that was wrongfully transferred to the Maples and $50,000 of Rutherford's money that was wrongfully transferred to the Hollies.
 
 
 33
 Assuming arguendo that the intervenors' tracing method is valid, we are still not persuaded that the intervenors intended to establish an express trust when they gave investment money to Benskin. Such a conclusion is a stretch, against which equity weighs, because "to allow [the intervenors] to trace beyond the depleted escrow funds and to compete with the Trustee would be to elevate the [intervenors'] claims above an avoidance recovery for all creditors and to allow [the intervenors] a better recovery than similarly defrauded creditors." J.A. at 60.
 
 
 34
 B. A Constructive Trust?
 
 
 35
 Regarding the imposition of a constructive trust in favor of the intervenors, this court's recent opinion in In re Omegas Group is dispositive. In Omegas, an aggrieved creditor argued that it was the beneficiary of a constructive trust, which was established by the debtor's pre-petition fraud, and that the funds held by Omegas should be turned over to the creditor rather than being incorporated into the bankruptcy estate. 16 F.3d at 1447. This court began its analysis by noting that "a constructive trust is not really a trust," but a "legal fiction, a common-law remedy in equity that may only exist by the grace of judicial action." Id. at 1449. Thus, this court stated that "a claim filed in bankruptcy court asserting rights to certain assets 'held' in 'constructive trust' for the claimant is nothing more than that: a claim. Unless a court has already impressed a constructive trust upon certain assets or a legislature has created a specific statutory right to have particular kinds of funds held as if in trust, the claimant cannot properly represent to the bankruptcy court that he was, at the time of the commencement of the case, a beneficiary of a constructive trust held by the debtor." Id. (footnote omitted). Based on this reasoning, this court held the following:
 
 
 36
 We think that Sec. 541(d) simply does not permit a claimant in the position of [the creditor] to persuade the bankruptcy court to impose the remedy of constructive trust for alleged fraud committed against it by the debtor in the course of their business dealings, and thus to take ahead of all creditors, and indeed, ahead of the trustee. Because a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to judgment "impressing' defendant's property or assets with a constructive trust. Therefore, a creditor's claim of entitlement to a constructive trust is not an "equitable interest" in the debtor's estate existing prepetition, excluded from the estate under Sec. 541(d).
 
 
 37
 Id. at 1451.
 
 
 38
 Like the aggrieved creditor in Omegas, the intervenors in this case have nothing more than a "claim filed in bankruptcy court asserting rights to certain assets 'held' in 'constructive trust"' for them. They possess no pre-petition judgment from a court that impressed the investment funds with a constructive trust in their favor. Thus, they do not have an equitable interest that would exclude the funds from the bankruptcy estate.
 
 
 39
 In sum, we find the lower courts correctly held that the bankruptcy trustee could avoid the fraudulent transfers to the Maples and the Hollies, and that the trustee's right to these funds was superior to that of the intervenors. Finding that all of Benskin's investors should be treated equally, as unsecured creditors, furthers the goals of the Bankruptcy Code by allowing an equitable system of distribution.
 
 III.
 
 40
 Finally, we consider the intervenors' contentions that the bankruptcy court's refusal to grant their motions for summary judgment was an abuse of discretion. Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880 (1988). After examining the arguments of the intervenors, the district court held that "[a]lthough different and novel interpretations of the events that occurred are possible in this instance, this Court believes the final order issued by the Bankruptcy Court is the correct conclusion of law and findings of fact." J.A. at 78, 258. Based on the foregoing analysis, we agree with the district court that the bankruptcy court did not abuse its discretion in denying the intervenors' motions for summary judgment.
 
 IV.
 
 41
 For the aforementioned reasons, we AFFIRM the decisions of the lower courts in both cases, No. 94-5421 and No. 94-5422.
 
 
 
 *
 The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The financial scheme that Charles Ponzi utilized and the remarkable response by investors is reported in Cunningham v. Brown, 265 U.S. 1 (1924). It seems Ponzi borrowed from investors against only his personal 90-day notes, issued for 150% of the amount borrowed. Ponzi took in $9,582,000in eight months. After a Boston newspaper published a report that Ponzi was hopelessly insolvent, investors demanded the return of their money. The defendants in the case obtained payment shortly before Ponzi's bankruptcy petition was filed. The lower courts accepted defendants' argument that they had rescinded for fraud and that payments to them merely represented a return of their own money. Disagreeing, the Supreme Court found the payments were preferences even if it assumed defendants had rescinded for fraud, because it was impossible for defendants to trace their funds. "It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt[cy] law." Id. at 12-13
 
 
 [2]
 The bankruptcy court found, and the parties did not dispute, that Benskin conducted his business as a sole proprietorship and ignored corporate formalities
 
 
 [3]
 Alan Exelbierd, the accountant for the trustee, testified that in 1987 Benskin deposited $2,282,000 and disbursed $2,282,000, including $504,578.74 to himself, and in 1988 he deposited $1,992,902.38 and disbursed $1,914,775.03, including $519,422.27 to himself
 
 
 [4]
 During the course of the proceedings Beverly Poston died. Marnie Fernandez, her daughter and executrix of the estate of Beverly Poston, was duly substituted
 
 
 [5]
 In pertinent part, section 548 reads as follows:
 (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
 (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
 (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
 (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
 (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
 (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
 11 U.S.C. Sec. 548(a) (1988).
 
 
 [6]
 We also agree with the bankruptcy court that the trustee met his burden of proof under section 548(a)(2), but because of our holding pursuant to section 548(a)(1), we find it unnecessary to develop this analysis