**ZENTER GBV FUND IV,
LLC Appellant,**

v.

**Paul J. VESPER, Trustee for Norcross
Footwear, Inc.; Internal Revenue
Service, Appellees.**

**Michael L. CAPPY, Appellant,**

v.

**Paul J. Vesper, Trustee for Norcross
Footwear, Inc.; Internal Revenue
Service, Appellees.**

**Nos. 00–5385, 00–5386.**

United States Court of Appeals,
Sixth Circuit.

Aug. 29, 2001.

Before NORRIS and COLE, Circuit Judges; STEEH, District Judge.*

OPINION

NORRIS, Circuit Judge.

Michael Cappy (Cappy) and Zentek GBV Fund IV, LLC (Zentek) appeal from the judgment of the district court affirming the bankruptcy court's confirmation of the trustee's plan under 11 U.S.C. § 1129(b)(1). For the reasons that follow we affirm the district court.

I.

In 1992, Norcross Industries, Inc. (NII), was a subchapter C holding company which owned and controlled a number of subsidiaries, including Norcross Footwear, Inc. (NFI). That same year, Cappy, who owned 87% of NII, became interested in making an initial public offering (IPO) of NII. Following discussions with legal and financial advisors, it was decided that the best course of action was a downstream merger of NII into NFI after NII had been divested of its non-footwear assets. The question soon became how to divest NII of such assets without incurring substantial tax liabilities; the answer adopted was to have Cappy execute a series of six promissory notes (Six Notes) for NII's non-footwear assets (essentially buying assets he already indirectly owned). These notes would then be acquired by NFI and distributed to Cappy over time.

This elegant tax plan soon floundered on NFI's lack of profitability. By 1994, the planned IPO had been shelved, and NFI began to experience serious financial difficulties. Within a year, the possibility loomed that one of NFI's secured creditors, Churchill Capital (Churchill), might take control of NFI through a stock pledge held by Churchill. Cappy's response was to embark upon a series of maneuvers designed to prevent Churchill from taking over NFI. Central to these efforts was the drafting of a consolidated note (Exploding Note) which replaced the earlier Six Notes and provided that it would be forgiven upon the occurrence of certain specified events, among which were (i) NFI's change in status from a subchapter S to a subchapter C corporation; (ii) change in control of NFI; and (iii) insolvency or bankruptcy.

In addition to the Exploding Note, NFI—at the direction of Cappy—executed a management agreement with Cappy that

---

* The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

would pay him three years' salary ($1,945,-000) in the event NFI was taken over. The management agreement also required NFI to purchase 2,700 shares of Carlaw, another Cappy footwear company which also was suffering severe financial problems, for $148 a share if there was a change in control of NFI. In addition, NFI purchased a 21% interest in Carlaw's preferred stock from Cappy with a note valued at $320,000. This last transaction not only caused NFI to lose its subchapter S status (thus triggering the Exploding Note) but also gave Cappy a possible setoff for any liability he might incur if the Exploding Note was not forgiven.

Sometime in 1995 or 1996, NFI agreed to secure a 1992 obligation to the Michael L. Cappy Foundation (MLC Foundation) by pledging the Exploding Note. During the same time period, the financial hemorrhaging of NFI continued unabated, until, that is, a restructuring plan was devised in which outside investors funded a spinoff of NFI's largest division, Norcross Safety Product (NSP), into a new limited liability corporation in which NFI was to be the majority owner.

NSP's birth was the death of NFI and Red Ball, a related subsidiary. While both Red Ball and NFI were able to retire their secured debt due to the restructuring, both companies were left as shells of their former selves. In July 1995, almost all of NFI's assets were sold to Red Ball in return for Red Ball assuming most of NFI's liabilities and a note in the principal amount of $6,450,000. The Exploding Note was excluded from this transaction, as was NFI's note to the MLC Foundation. At the time of the transaction, Cappy was the chairman of NFI and the sole director of Red Ball.

In February 1996, both NFI and Red Ball filed for Chapter 11 protection under the Bankruptcy Code; neither company successfully re-organized as debtors-in-possession and separate Chapter 11 trustees were appointed. In the NFI proceeding, Cappy filed claims against NFI and the Trustee brought seven causes of action against Cappy. The bankruptcy court dismissed all these causes of actions, except for the Trustee's efforts to collect the money owed to NFI on the Six Notes.

The bankruptcy court initially addressed the question of whether or not execution of the Exploding Note was a preferential or fraudulent transaction avoidable under 11 U.S.C. § 548 and concluded that:

> Here, as noted in our factual findings above, we find that the Exploding Note was executed to "pay off" the Six Notes with the clear and unmistakable intent to hinder, delay and defraud Churchill Capital and all other creditors of NFI. The forgiveness or exploding provisions were a mere alternative to the distribution of these notes to Cappy, an action which would have been an obvious fraudulent conveyance. Therefore the execution of the Exploding Note and the resulting satisfaction of the Six Notes are avoided as a fraudulent conveyance under 11 U.S.C. § 548.

(Bankr.Ct. Op., June 19, 1998, at 17.) The bankruptcy court also found that Cappy was only entitled to a setoff pursuant to 11 U.S.C. § 553 for the MLC Foundation Note and that Cappy's remaining allowed claims should be equitably subordinated pursuant to 11 U.S.C. § 510. The bankruptcy court concluded that:

> [A]s long as NFI was sailing along, making profits and meeting its debts, Cappy could distribute the Notes at his discretion, subject only to the watchful eye of state and federal taxing agencies. However, once NFI struck the iceberg of financial difficulties, Cappy's ability to distribute the Notes became more limited. While bankruptcy law does not re-

quire Cappy to assume the role of a sea captain and always be the last creditor of the sinking debtor, by the same token it does prevent an individual in Cappy's insider position from taking all steps necessary to be the first person away from the disaster in an economic lifeboat.

Here, Cappy made sure that he could leave the sinking hulk of NFI, in a well stocked lifeboat, free from any obligation to NFI or its creditors and with numerous claims against the Debtor.

(Bankr.Ct. Op., June 19, 1998, at 32–33.) The bankruptcy court thus found Cappy liable to the bankruptcy estate of NFI in the amount of the Six Notes plus interest.

## II.

In March 1998, as the events described above unfolded, Cappy formed Zentek. Cappy owned 1% of Zentek (a family trust held the remaining 99%) and was the company's managing member. Zentek's purpose was to serve as a holding company to purchase claims in the NFI and Red Ball bankruptcy. To facilitate the acquisition of unsecured claims Zentek engaged the services of the Bankruptcy Creditors Bureau (BCB), which, in turn, acted as Zentek's agent in the acquisition of claims belonging to unsecured creditors using money from the Cappy family trust. Among the claims acquired was that of the Endicott Johnson Corporation (E.J.claim), which had a claim for $1,000,000 against NFI.[1]

In August 1998, Cappy filed a reorganization plan for NFI, at which point Zentek gave Cappy a voting proxy to allow him to vote the claims Zentek had acquired. However, because Cappy had not filed a disclosure statement, the plan was never circulated and was instead stricken by the bankruptcy court. Subsequently, Cappy negotiated with Johan Schaberg (Schaberg) to allow Schaberg to purchase a majority position in Zentek for $275,000. In January 1999, Schaberg became the managing member of Zentek and the voting proxy was withdrawn from Cappy.

The trustee filed his plan on March 3, 1999, and on June 21, 1999, Schaberg executed the ballots for Zentek and voted the 32 claims Zentek had acquired in opposition to the trustee's plan. Among the claims voted was the E.J. claim, which, at $1,000,000, was by far the largest of the class 4 (unsecured creditors) claims voted. The trustee objected to the E.J. claim; the bankruptcy court overruled the trustee's objections to the E.J. claim, but also stated that allowance of the E.J. claim could be taken up later upon an appropriate motion. Zentek then filed a motion to allow the E.J. claim to be voted; the trustee responded by filing a motion on June 26, 1999, seeking to designate the E.J. claim pursuant to 11 U.S.C. § 1126(e). The bankruptcy court entered an order on July 2, 1999, granting the trustee's motion to designate the E.J. claim.

## III.

At the time of the bankruptcy proceedings, NFI was obligated to make contributions to the S & T Industries Master Hourly Retirement Plan (S & T Pension Plan). NFI was unable to meet its obligations under the S & T Pension Plan and as a result the Pension Benefit Guaranty Corporation (PBGC) filed a claim for amounts due and the Internal Revenue Service (IRS) filed a tax claim related to the funding deficiencies. The IRS sought

---

1. The E.J. claim was originally for $1,400,000 but had subsequently been reduced to $1,000,000.

to have its claim classified as a priority tax claim. The trustee objected, asserting that the IRS held only an unsecured claim. The trustee's objections were set for a hearing on May 17, 1999.

In the interim, the trustee filed his plan and a disclosure statement with the bankruptcy court on March 3, 1999, and filed a second amended disclosure statement on May 17, 1999. At the hearing on May 17, 1999, the trustee indicated that settlement negotiations with the IRS had resulted in an agreement, contingent upon confirmation of the trustee's plan, that the IRS's claim in the amount of $321,017 would be allowed as a class 8 unsecured claim under the proposed plan. On June 3, 1999, this tentative agreement was formalized and, seven days later, approved by the bankruptcy court. However, the bankruptcy court then vacated this order on June 29, 1999, because it had approved the agreement without notice of objections to creditors.

Thus, at the time of the confirmation hearing on June 30, 1999, the IRS's claim had not been formally allowed by the bankruptcy court. The IRS's claim was voted on a ballot which did not indicate which class the IRS believed itself to be in, but instead simply indicated that the claim was an unsecured one. Zentek then filed a motion to designate the vote of the IRS under 11 U.S.C. § 1126(e). The trustee responded, and asked that the IRS's vote be counted under Bankruptcy Rule 3018;[2] Zentek then objected to counting certain ballots, including that of the IRS. The bankruptcy court rejected Zentek's motion to designate and allowed the IRS to temporarily vote its claim.

Allowance of the IRS claim for voting purposes resulted in an unsurprising tally: class 4, which consisted of unsecured creditors, voted to accept the trustee's plan (although the result would have been different if the E.J. claim had been allowed); class 6, which represented Cappy's claims, voted against the plan; and, finally, class 8, representing the IRS claim, voted in favor of the plan. All of these classes consisted of impaired claims. The Bankruptcy Code allows for a plan to be confirmed over the objections of some creditors as long as the requirements of 11 U.S.C. § 1129(b) are satisfied; amongst these requirements is approval by at least one class of impaired claims. Finding such approval in this case, the bankruptcy court confirmed the trustee's plan pursuant to the judicial cramdown provisions of § 1129(b).

Zentek, obviously hoping that the bankruptcy court's decision regarding the E.J. claim might be reversed on appeal, objected to the IRS's claim being considered a class 8 claim rather than a class 4 claim and argued that the IRS claim should be designated under 11 U.S.C. § 1126(e). The bankruptcy court rejected each of these contentions and on July 2, 1999, the bankruptcy court entered the confirmation order. The district court subsequently affirmed the various decisions of the bankruptcy court. This consolidated appeal followed.

## IV.

In any bankruptcy proceeding, the bankruptcy court is the finder of fact. *Hardin v. Caldwell (In re Caldwell)*, 851 F.2d 852, 857 (6th Cir.1988). Upon appeal, the district court reviews the bankruptcy court's

---

**2.** Bankruptcy Rule 3018(a) provides, in relevant part, that: "Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim

or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." FED. R. BANKR. P. 3018(a)

factual findings for clear error, and its legal conclusions de novo. *Nicholson v. Isaacman (In re Isaacman)*, 26 F.3d 629, 631 (6th Cir.1994). "On appeal to this court, we consider the judgment of the bankruptcy court directly, using the same standards of review as the district court." *Id.* (citing *Michigan Nat'l Bank v. Charfoos (In re Charfoos)*, 979 F.2d 390, 392 (6th Cir.1992)).

We begin our analysis by examining the bankruptcy court's decision to avoid the Exploding Note entered into by Cappy. Section 548(a)(1)(A) provides that:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
>
>> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. § 548(a)(1)(A).[3] A finding of "actual fraudulent intent by the bankruptcy court is a factual finding that we will reverse only upon a showing of clear error." *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1353 (8th Cir. 1995); *see also Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 805 (9th Cir.1994).. "Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer." *In re Sherman*, 67 F.3d at 1353; *see also Emerson v. Maples (In re*

*Mark Benskin & Co.)*, Nos. 94–5421/5422, 59 F.3d 170, 1995 WL 381741, at *5 (6th Cir. June 26, 1995) (unpublished per curiam) ("In determining whether the debtor has the requisite intent, this court looks to the circumstances surrounding the transaction.") (citing *United States v. Berman*, 884 F.2d 916, 921–22 (6th Cir.1989)).

■ Upon appeal, Cappy presents three grounds for reversing the bankruptcy court's determination that execution of the Exploding Note was a fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A): (i) there was no intent to hinder, delay or defraud creditors as the Exploding Note was entered into as a means to prevent hasty action on the part of Churchill from adversely affecting NFI; (ii) even if there was an intent to hinder, delay or defraud there was no harm to creditors as both secured and unsecured creditors were substantially paid in full less than a year after execution of the Exploding Note; and (iii) the Exploding Note simply reflected the parties' understanding that Cappy was never to become liable on the Six Notes he executed to purchase NII's non-footwear assets. We reject each of these contentions in turn.

In support of his first argument Cappy cites to a district court decision in which it was noted that "[w]here ... the debtor is motivated by a purpose to protect his credit standing, to continue in business, and to rehabilitate himself financially, his action in making transfers has often been held not to be fraudulent in fact notwithstanding his insolvency at the time of entering such transactions." *Stratton v. Sioux Falls Paint and Glass (In re Stratton)*, 23 B.R. 284, 287 (D.S.D.1982) (quoting 4 COLLIER ON BANKRUPTCY ¶ 548.02[5] ). Howev-

---

3. Section 548(a)(1)(A) was formerly designated as § 548(a)(1) before amendment by the Religious Liberty and Charitable Donation Protection Act of 1998, Pub.L. No. 105–183 (1998).

er, *In re Stratton* involved debtors who executed a second mortgage in favor of a creditor after the "creditor ... went to debtor with an offer to delay proceedings in return for security on the debts owed by debtor." *Id.* at 287. Under such circumstances the district court concluded that while one creditor may have been preferenced over others, there was no indication of any fraudulent intent. *Id.* at 287–88. The facts of this case are completely dissimilar: the execution of the Exploding Note was done neither at the behest of a creditor nor to benefit a creditor. Instead, the Exploding Note was intended to erase Cappy's obligation to NFI, an obligation that represented one of the few viable assets of NFI.

Cappy's second argument is straightforward: even if there was actual intent, there was no harm to any of the secured or unsecured creditors of NFI; thus, it was clearly erroneous to find that a fraudulent conveyance had occurred when the very entities alleged to have been harmed in fact had their claims satisfied. However, a review of the evidence presented to the bankruptcy court indicates that the claims of some unsecured creditors remained unsatisfied. Indeed, Cappy's own appellate brief states only that "substantially all of the unsecured creditors received full payment during 1995." (Cappy Br. at 34.) No more need be said; it is incongruous to contend that unsecured creditors suffered no harm while conceding that the claims of

some unsecured creditors remained unsatisfied.[4]

Cappy's final argument is that the notes were no more than a tax device, and were never intended to represent substantive obligations on his part to NFI. But that the notes were intended simply as tax devices, does not rob them of their substantive content. Put simply, Cappy entered into a tax strategy that promised significant tax benefits, but also carried with it considerable risk. Having not reaped the benefit, Cappy now wants to avoid the risk. In the words of the bankruptcy court:

> Here, Cappy argues that the Notes can't be real since it is unreasonable to assume that he would pay approximately $2.8 million for assets he "owned" and which could have been distributed to him with an approximate $1,000,000.00 tax liability. Unfortunately for Cappy this *now* "unreasonable" transaction was at the time of its inception a clever tax strategy which could have saved Cappy hundreds of thousands of dollars had NFI made money. As discussed before Cappy gave the Six Notes to purchase valuable assets from NFI on credit. Cappy received those assets and cannot now complain that the Six Notes are "unreal" because his tax strategy failed.

(Bankr.Ct. Op., June 19, 1998, at 21.) As the bankruptcy court did not err, its determination that execution of the Exploding Note was a fraudulent conveyance under 11 U.S.C. § 548(a)(1)(A) is affirmed.

---

4. Cappy raises the further argument that it does not matter whether the unsecured creditors were paid because the only party the Exploding Note could have been intended to hinder, delay or defraud was Churchill, which was subsequently paid in full. This argument is legally baseless. In *In re Mark Benskin* the intervenors argued that "that in transferring funds to the Hollies and the Maples, Benskin only had the intent to defraud the intervenors and not the other creditors in general." *In re*

*Mark Benskin*, 1995 WL 381741, at *5. This court responded that "even if this is true, such intent brings the transfer within the purview of section 548(a)(1). The trustee need only show that when the debtor made the transfer, he intended to defraud any entity to which he was indebted ." *Id.* Thus, even if Cappy intended only to hinder, delay or defraud Churchill the fact that other creditors were harmed brings Cappy's actions squarely within the strictures of § 548(a)(1)(A).

Cappy's next claim may be dealt with briefly. Before the bankruptcy court, Cappy argued that the extent to which he was held liable to NFI should be set off by the amount of his claims against NFI. These claims, of which there were ten, ranged from unpaid bonuses to stock options. While the bankruptcy court allowed many of the claims, it only allowed Cappy to set off his claim related to the Foundation Note. Before this court, Cappy contends that the bankruptcy court erred when it did not allow him to set off two claims: a promissory note from NFI to purchase an option to buy stock and an unpaid bonus of $231,375. Having had the benefit of oral argument, and having reviewed the briefs submitted by the parties, we are of the belief that the bankruptcy court did not err when it declined to allow Cappy any setoff rights beyond that for the Foundation Note. We therefore affirm.

■ The bankruptcy court also equitably subordinated Cappy's claims against NFI pursuant to 11 U.S.C. § 510. Section 510 provides, in relevant part, that:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may -

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest. . . .

11 U.S.C. § 510(c). In determining whether claims should be subject to equitable subordination, this court has adopted the three-part test set forth in *Benjamin v. Diamond (In the Matter of Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977). In that case, the Fifth Circuit held that in order for equitable subordination to be proper the following three conditions must be met: "(i) The claimant must have engaged in some type of inequitable conduct. (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant. (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." *Id.* at 700 (internal citations omitted); *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 717–18 (6th Cir.1992) (adopting *Mobile Steel* test); *see also United States v. Noland*, 517 U.S. 535, 539, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (setting out the *Mobile Steel* test and noting that "[t]he District Courts and Courts of Appeals have generally followed the *Mobile Steel* formulation"). The legal standard in applying the *Mobile Steel* test varies depending on whether the creditor is an insider. *See In re Baker & Getty Fin. Servs., Inc.*, 974 F.2d at 718. Where, as here, the creditor is an insider more exacting scrutiny will be given to his dealings with the debtor. *Id.* (citing *Anaconda–Ericsson, Inc. v. Hessen (In the Matter of Teltronics Servs., Inc.)*, 29 B.R. 139, 169 (Bankr. E.D.N.Y.1983)).

Cappy's sole assignment of error is that the second *Mobile Steel* requirement should be read in the conjunctive, rather than the disjunctive; thus, in this case, because there was no harm to creditors, Cappy's claims should not have been equitably subordinated. Cappy cites to *In re Mayo*, 112 B.R. 607 (Bankr.D.Vt.1990), and is correct that the court in that instance concluded that the test should be in the conjunctive. *Id.* at 651. But, as the court in *In re Mayo* acknowledges, "*Mobile* . . . articulates a disjunctive test." *Id.* This court has long subscribed to the *Mobile Steel* test and we decline Cappy's invitation to adopt the reasoning of the bankruptcy court in *In re Mayo*. As a result, we find no error in the bankruptcy court's

decision to equitably subordinate Cappy's claims under 11 U.S.C. § 510 and thus affirm.

## V.

We turn now to Zentek's claims upon appeal. Primary among them is that the bankruptcy court erroneously designated the E.J. claim under 11 U.S.C. § 1126(e) by concluding that the E.J. claim was not voted, solicited or procured in good faith.

A bankruptcy court's determination of the presence or absence of "good faith" under the Bankruptcy Code is based on the totality of the circumstances and is reviewed for clear error. *See Society Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588, 591 (6th Cir.1992) (discussing good faith determination in context of Chapter 13); *see also Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.)*, 118 F.3d 635, 638 (9th Cir. 1997) (applying clear error standard to good faith determination under § 1126(e)).

Section 1126(e) provides that "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title." 11 U.S.C. § 1126(e). The meaning of "good faith" is not further defined by the Bankruptcy Code, and its definition has been left to the courts.

The Supreme Court, applying the predecessor to § 1126(e), stated that the statutory provision was meant to apply to those "whose selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt assets." *Young v. Higbee Co.*, 324 U.S. 204, 211, 65 S.Ct. 594, 89 L.Ed. 890 (1945). Similarly, the Fourth Circuit has noted that a "creditor may not

cast his vote for an ulterior purpose and expect to have it counted. Ulterior motives have been held to include pure malice, strikes and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business." *Insinger Mach. Co. v. Federal Support Co. (In re Federal Support Co.)*, 859 F.2d 17, 19 (4th Cir.1988) (internal quotation and citation omitted). But,

> [i]t is clear … that the Bankruptcy Code does not require "selfless disinterest." *In re Applegate Property, Ltd.*, 133 B.R. 827, 834 (Bankr.W.D.Tex.1991). Indeed, "the mere fact that a purchase of creditors' interests is for … securing the approval or rejection of a plan does not of itself amount to 'bad faith.'" *In re Allegheny Int'l, Inc.*, 118 B.R.282, 289 (Bankr.W.D.Pa.1990) (alteration in original) (citation omitted). If bad faith could be found any time a claim is purchased to block approval of a plan, there would be no incentive to purchase claims. *See In re Marin Town Ctr.*, 142 B.R. 374, 379 (Bankr.N.D.Cal.1992) ("Were this court to adopt Debtor's position [that bad faith exists whenever claims are purchased to block approval of a plan], investors would have little incentive to purchase claims from any creditor in bankruptcy").

*255 Park Plaza Assocs. Ltd. P'ship v. Connecticut Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1219 (6th Cir.1996).

■ Creditors may therefore act out of self-interest; but they may not act for ulterior motives. Here, Cappy formed Zentek with the purpose of acquiring unsecured claims such as the E.J. claim in order to block approval of the trustee's plan. In doing so he appears to have acted with the ulterior purpose of gaining an advantage for himself in any future

negotiations with the trustee so as to possibly limit his own liability to NFI. Zentek counters by arguing that at the time the E.J. claim was voted, it was Schaberg, not Cappy, who dictated how the claims acquired by Zentek would be voted. While true, we find this argument unavailing. Courts have not limited their inquiries to only the moment of voting but have also examined the motivation underlying the purchasing of claims. *See In re Waterville Valley Town Square Assocs., L.P.,* 208 B.R. 90, 95 (Bankr.D.N.H.1997) (examining motives of creditor who purchased claims prior to voting). Thus, under the totality of the circumstances, we do not believe that the bankruptcy court clearly erred when it designated the E.J. claim pursuant to § 1126(e) and we therefore affirm.[5]

## VI.

Zentek contends that the bankruptcy court should have designated the IRS claim because it was improperly solicited or procured within the meaning of § 1126(e). Zentek also argues that the trustee's solicitation of the IRS claim violated 11 U.S.C. § 1125(b) which prohibits solicitation prior to the bankruptcy court's approval of a disclosure statement.

As noted earlier, § 1126(e) permits the bankruptcy court to "designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance

with the provisions of this title." 11 U.S.C. § 1126(e). Section 1125(b) prohibits the solicitation of acceptances or rejections of a proposed plan until the solicited party has received both a copy of the reorganization plan and a disclosure statement approved by the bankruptcy court. *See* 11 U.S.C. § 1125(b).[6]

### i) Section 1125(b) Violation

Before this court, Zentek argues that the trustee improperly solicited and/or procured the IRS claim by reaching a settlement agreement with the IRS before the voting of the IRS claim. The meaning of solicitation is not defined in the Bankruptcy Code, but the courts have generally defined the term narrowly. In the words of one court:

> The terms "solicit" and "solicitation," as used in § 1125(b) of the Code, must be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan of reorganization. The terms do not encompass discussions, exchanges of information, negotiations, or tentative arrangements that may be made by the various parties in interest in a bankruptcy case which may lead to the development of a disclosure statement or plan of reorganization, or information to be included therein. If these activities were prohibited by Section 1125(b),

---

**5.** Resolution of this issue essentially resolves Zentek's claims upon appeal, as affirmance of the bankruptcy court's designation of the E.J. claim means that at least one class of impaired creditors voted in favor of the trustee's plan, thus satisfying the requirements of 11 U.S.C. § 1129(b). For this reason our discussion of the remaining issues raised upon appeal will be limited.

**6.** Section 1125(b) provides that:
(b) An acceptance or rejection of a plan may not be solicited after the commence-

ment of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor.
11 U.S.C. § 1125(b).

meaningful creditor participation in Chapter 11 cases would cease to exist. It follows that an unauthorized "solicitation" would include a specific request for an official vote for or against a plan of reorganization (a) that is made before dissemination to parties in interest of an approved disclosure statement, or (b) that is made after the dissemination of a disclosure statement, and which contains misrepresentations or deliberate falsehoods and misleading statements calculated to deceive parties entitled to vote, or (c) that refers to a plan of reorganization predicated upon arrangements that were arrived at by fraud or that were not adequately disclosed to the court and to parties in interest in the approved disclosure statement.

*In re Snyder,* 51 B.R. 432, 437 (Bankr. D.Utah 1985); *see also Century Glove, Inc. v. First Am. Bank of New York,* 860 F.2d 94, 101 (3d Cir.1988) ("We agree with the district court that 'solicitation' must be read narrowly. A broad reading of § 1125 can seriously inhibit free creditor negotiations.") (internal quotation omitted); *In re Dow Corning Corp.,* 227 B.R. 111, 118 (Bankr.E.D.Mich.1998) ("In other words, negotiation over the terms of a plan and disclosure statement do not violate the prohibition of § 1125(b) ."); 7 COLLIER ON BANKRUPTCY ¶ 1125.03[1][a], 1125–17 (15th ed. rev.2000) (solicitation should be limited to "the formal polling process in which the ballot and disclosure statement are actually presented to creditors with respect to a specific plan and should not be read so broadly as to chill the debtor's postpetition negotiations with its creditors"). There is no indication in this case that the trustee's pre-disclosure negotiations with the IRS constituted a solicitation within the meaning of § 1125(b) and we therefore affirm.

*ii) Designation under § 1126(e)*

Nor did the bankruptcy court's decision not to designate the IRS claim under § 1126(e) constitute clear error. There is no indication that the IRS claim was voted in bad faith, nor, as discussed above, is there any evidence that it was solicited or procured in bad faith. We therefore find no reason to disturb the conclusion of the bankruptcy court as affirmed by the district court.

## VII.

Zentek further contends that the bankruptcy court erred when it approved the trustee's separate classification of the IRS claim in class 8, rather than in class 4. "[A] bankruptcy court's decision to approve or reject the separation of claims proposed by a debtor will only be reversed if the party opposed to the court's decision can demonstrate that the court abused its discretion." *Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.,* 914 F.2d 810, 813 (6th Cir.1990).

Section 1122 of the Bankruptcy Code provides that:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122. This section clearly dictates that only substantially similar claims may be placed together, but it does not address the question of whether all substantially similar claims must be placed togther. *See, e.g., Boston Post Road Ltd. P'ship v. F.D.I.C. (In re Boston Post Road Ltd. P'ship),* 21 F.3d 477, 481 (2d Cir.1994) ("While the section bars aggregating dissimilar claims in the same class, it does not

explicitly address whether similar claims *must* be placed in the same class."). While a plan proponent must retain flexibility in determining the classification of claims, this court has acknowledged that such flexibility must have limits in order to prevent a plan proponent from gerrymandering classes to ensure confirmation. *See Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co.)*, 800 F.2d 581, 586 (6th Cir.1986) ("We agree with the Teamsters Committee that there must be some limit on a debtor's power to classify creditors in such a manner. The potential for abuse would be significant otherwise.").

In *In re U.S. Truck* the appellant claimed that the debtor's reorganization plan had gerrymandered the classes in order to neutralize the appellant's dissenting vote and gain approval of the plan. This court affirmed the district court's approval of the plan, noting that the varying interests of the creditors allowed for the separate classification of claims. *In re U.S. Truck*, 800 F.2d at 587. In this case the IRS's position was sufficiently different from those of other creditors to support separate classification. The bankruptcy court therefore did not abuse its discretion when it approved the trustee's classification of the IRS claim.[7]

### VIII.

The decision of the district court is affirmed.

---

7. Zentek also appeals from the bankruptcy court's ultimate entry of an agreed order reflecting the agreement between the IRS and the trustee. Due to the retirement of Judge Dickinson, and the appointment of a new judge, the entry of the agreed order appears to have been surrounded by some procedural confusion which the lower courts resolved by reference to the law of the case doctrine. We are reluctant to endorse use of the law of the case doctrine to resolve Zentek's objections to the agreed order. However, as we have affirmed both the bankruptcy court's confirmation of the trustee's plan as well as the trustee's classification of the IRS claim, we find no need to further address Zentek's claim.